THE ALERT.[1]

DAVIS COAST WRECKING CO. v. THE ALERT.

SAME v. BERG et al.

(District Court, S. D. New York. June 10, 1893.)

1. SALVAGE—CONTRACT — PROVINCE OF ADMIRALTY COURT—MUTUAL MISTAKE.
   It is the right and duty of a court of admiralty to inquire into the circumstances of a salvage contract, with a view of ascertaining its reasonableness and fairness; and in so doing it may take note of a mutual mistake, and award only such compensation as justice and equity may permit.

2. SAME—CONTRACTS MADE UNDER STRESS OF CIRCUMSTANCES—CONTRACTS ENTERED INTO DELIBERATELY.
   In contracts made at sea, under the stress of immediate necessity, the element of reward to the salvor enters beyond any quantum meruit for the work done. But where a salvage contract is made on land, between parties dealing upon equal terms, with full opportunity for deliberation, and equal knowledge of the facts, such contract should be treated like any other voluntary, deliberate contract for a specific service.

3. SAME—STRANDING—CONTRACT TO FLOAT—LIABILITY OF CARGO.
   The steamship A. went ashore on the coast of South America, and her agents there, being unable to procure local assistance, telegraphed to her

[1] Reported by E. G. Benedict, Esq., of the New York bar.

agents at New York, who engaged the libelant to get her afloat. This libelant agreed to do for 50 per cent. of the value of ship and cargo. The vessel, having been floated in safety, was brought to New York, when she was sold for $21,000, and her cargo for nearly $80,000. This suit was brought to enforce payment of one-half of the above sum under the salvage contract. The defense was that there had been a mistake as to the amount of cargo known to be aboard; that the proposition of 50 per cent. was excessive, and that the shipowners could not bind the cargo over to such an agreement. The evidence indicated that her agents must have known that she had cargo aboard before they made the contract; also that both parties contracted with reference to it. The service was rendered at a great distance, was expensive and arduous. The insurers of the cargo took no action of their own, and made no objection to the contract of the ship's agents; and the master, who was aboard the stranded vessel, and who knew of all the circumstances and of the contract, acquiesced in its terms. *Held,* that the court would not interfere with the enforcement of the contract, and the contract rate should apply to both ship and cargo.

4. SAME—VALUE OF CARGO—NET VALUE—GROSS VALUE.
   *Held,* that the net value of the cargo on arrival at New York, after deducting customhouse charges and any charges or liens for handling the cargo in order to convert it into money, was the "value" of the cargo contemplated in the salvage contract.

In Admiralty. These were two libels, filed by the Davis Coast Wrecking Company, one in rem against the steamship Alert and her cargo, and the other in personam against Berg and others, owners, etc. Decree against the vessel in the former, and for dismissal of the libel in the latter.

McFarland & Parkin, for libelants.
Butler, Stillman & Hubbard, for the Alert.
Sydney Chubb, for the cargo.

BROWN, District Judge. The above libels were filed to recover compensation for salvage services rendered by the libelant to the steamship Alert, which, on the 21st of November, 1892, was stranded not far from the mouth of the Magdalena river some five miles from Savanilla.

The Alert was a Norwegian steamship, which had been chartered by Mr. Vengoechea of New York, under which she had taken a cargo of general merchandise to be carried to Carthegena, Savanilla, and Santa Marta in South America, and was to bring a return cargo from the same ports. All except 100 barrels of her outward cargo was discharged at Carthagena and Savanilla, where she also took on board about 55 per cent. of her return cargo. She was stranded between the latter port and Santa Marta. The master on inquiry at Savanilla and Barranquilla being unable to find any means of assistance, under the advice of the charterer's agent there, and on the advice of the agents of the general marine underwriters, sent a telegraph to New York for help, received on November 30th by Hurlbut & Co. of New York, who were the general agents of the Norwegian owners. The next day the respondent Flood, the general agent of the underwriters on the hull in Norway, received a cable dispatch directing him to look out for their interests; and on the 2d of December, after receiving the refusal of the

Merritt Wrecking Company to attempt any rescue of the vessel, and there being some uncertainty as to the amount of cargo aboard of the Alert, Mr. Flood with the concurrence of Hurlbut & Co. accepted an offer of the libelants by letter to send out their wrecking tug the Right Arm, fitted with all proper appliances for the relief of the Alert; payment of $2,500 being guarantied by Hurlbut & Co. whether successful or not; and, if successful, the libelants to "receive 50 per cent. of the value of the vessel and cargo" without the $2,500. The acceptance of this offer was indicated by the signatures at the foot of the letter of "Hurlbut & Co., agents for owners," and Mr. Flood "as agent for underwriters of vessel."

On the 4th of December the Right Arm set out for Barranquilla, taking in additional coal at Norfolk. After leaving the latter port, she met with some accident which required her to put back to Norfolk again for repairs, which caused a few days' further detention, after which she proceeded to Savanilla and arrived near the stranded vessel on the 22d of December. The beach there was very sloping, and of soft yielding sand. The Alert had drifted about two miles from her first position, and was then high up on the beach, with only about six feet of water around her, except in the bed or cradle in which she lay; and the tug could not approach nearer than about three-quarters of a mile of her. A lighter was procured at Barranquilla, and additional chain cables and hawsers, and anchors were got out and properly attached. Upon the first attempt, after moving the vessel a short distance, the hawser was broken; and, in the bad weather of the few days following, the vessel went back head on to the beach, in a worse position than before. Upon the second attempt a few days afterwards, and after a continuous strain upon the hawsers of about 10 hours, the Alert was worked out of the sand so as to float, and was taken to the harbor of Barranquilla. During this time the vessel had not leaked and her cargo was not injured. No accident had happened to her, except during the last haul, when a mishap caused some injury to the stern and rudder post, but not any serious damage; and the vessel and cargo were subsequently towed by the Right Arm to New York. The proceeds of the vessel were $21,000; of the cargo, nearly $80,000. The libelants claim to recover the stipulated 50 per cent. upon these values. The actual expenses of the libelants' expedition are proved to have been between $10,000 and $11,000.

In behalf of the owners of the steamer it is contended that the contract fixing the compensation at 50 per cent. of the value of the vessel and cargo is excessive and exorbitant, as the cargo has turned out; and that the contract was made under a mutual mistake of fact, namely, upon the supposition that only a small amount of cargo was on board, to wit, the 100 barrels designed for Santa Marta, whereas in fact the Alert had taken on board about 55 per cent. of her return cargo at the ports of Carthagena and Savanilla. The insurers of the cargo make the same defense; and they also contend that the contract made does not purport to bind, and does not bind, the owners of the cargo at all.

1. Mutual Mistake. Although it is no part of the jurisdiction of

this court, as a court of admiralty, to reform contracts on the ground of mutual mistake, yet, where the subject of the contract is a salvage service, the court, under the law applicable to that special head of jurisdiction, may inquire into all the circumstances of the salvage contract, including its reasonableness and fairness; and in doing this, it must take note of the fact of a mutual mistake, if that is proved to exist, and award only such compensation as justice and equity may permit. The right and the duty of a court of admiralty to examine into the fairness and reasonableness of every salvage contract, whenever its fairness is challenged, have been repeatedly asserted by the supreme court; and such has been the uniform practice in this district, as well as in others. Post v. Jones, 19 How. 160; The Tornado, 109 U. S. 110, 117, 3 Sup. Ct. Rep. 78; The Emulous, 1 Sumn. 210; The A. D. Patchin, 1 Blatchf. 414; The Adirondack, 2 Fed. Rep. 387, 392; The C. & C. Brooks, 17 Fed. Rep. 548; Chapman v. Engines of the Greenpoint, 38 Fed. Rep. 671; The G. W. Jones, 48 Fed. Rep. 925; The Sirius, 53 Fed. Rep. 611; The Schiedam, 48 Fed. Rep. 923. What was said in the case last cited as regards the binding force of such contracts, was said, as the context shows, in reference to contracts made at sea, in peril, and under the pressure of immediate necessity. In such contracts, so far as the element of a reward enters into the compensation allowed, that is, an allowance wholly beyond the mere quantum meruit for the work and labor performed, as a reward given as a premium, on grounds of public policy, to encourage the maintenance of salvage equipments and to induce speedy and heroic efforts for the safety of life and property—this element cannot logically or properly become a subject of barter, or of any irreviewable contract between the parties; since that would permit the parties to usurp pro tanto the functions of the court.

But these considerations are applicable but slightly if at all to contracts, which, like the present, are made upon land, between parties dealing upon equal terms, with full opportunity for deliberation, with equal knowledge of the facts, and under the ordinary conditions of nonmaritime contracts. Such contracts should be treated like other voluntary, deliberate contracts for a specific servi . Bondies v. Sherwood, 22 How. 214; The Agnes I. Grace, 2 C. C. A. 581, 51 Fed. Rep. 959.

The contract in this case was made with deliberation and with the utmost fairness. Everything known to either was apparently communicated to all concerned. The evidence does not show a case of mistake at all; but only uncertainty as to the amount of cargo on board. This uncertainty is shown to have been present in the minds of all the contracting parties, before the contract was signed. The contract was evidently made in view of that very uncertainty, and the intent was to give the libelants the benefit of it, if they would take the risk of the expedition. The evidence indicates that the most common practice of vessels trading at those ports was not to take in the return cargo until after completely discharging at the most distant port, and to stop at the intermediate ports on the way back for

the return cargo. But this practice was by no means uniform; and the fact that so very small a portion of the outward cargo was to be carried to Santa Marta, was in itself sufficient to suggest that the Alert might, in this instance, follow the other practice which also was not uncommon, to take in her return cargo at the intermediate ports upon the outward trip.

Before the contract was signed on December 2d, all the parties knew that the charterer in New York had received from the Alert, or her agent at Barranquilla, the following telegram: "Steamship Alert sailed, fair cargo, 20th November; it is reported aground at Bocas de Ceniza; may be got off; we can give no assistance whatever." The substance of this telegram was cabled to the libelants' agent at New Bedford on the 1st of December, stating that the cargo was "probably hides and coffee;" and that surmise was correct. The telegram was again shown to the libelants' representative when he came to this city on the following day and made the contract for "50 per cent. of the vessel and cargo." The plain meaning of that telegram was that the steamer Alert had sailed with a fair cargo on board on the 20th of November; that is, from the port of Columbia, the harbor of Savanilla, for Santa Marta. It is as explicit as would be naturally expected in an expensive cablegram. It was designed to report the vessel ashore, and that no assistance could be got there. The only imaginable reason for stating that she had sailed with a fair cargo on the 20th of November was, that the charterer here might know from the telegram the general condition of the ship and cargo, sufficiently to constitute a basis for obtaining assistance here. I cannot, therefore, give any force to the suggestion of the respondents that they thought the words "fair cargo" might refer to a cargo merely engaged at Savanilla, and expected to be taken on board on the return trip. It is plain that the libelants had no such idea; and on their part there was no mistake.

Though the contract was made on the 2d December, the Right Arm did not sail until the 4th of December, nor did she leave Norfolk until several days thereafter. On the 3d, however, a further telegram appeared in the maritime miscellany of the New York Herald, which was seen by the defendants, stating that the Alert had 600 tons of cargo on board for New York, though this was in excess of what she actually had. After this there was abundant opportunity before the Right Arm sailed for either of the defendants to have sought a modification of the contract on the basis of that information, and to notify the libelants, if the Santa Marta cargo had been in fact the basis of the contract. Yet no such notice was given, nor any attempt made to modify the contract. After such information, to wait until the other party performed the contract, would in equity estop the defendants from any subsequent rescission or reformation. Subsequent telegrams contained contradictory statements in regard to the amount of cargo on board and whether it was landed or not. The Merritt Company had absolutely refused to send out any expedition for a compensation of 50 per cent. of its value, because 50 per cent. on the ship

was insufficient; and because the amount of cargo on board was uncertain. The libelants received instructions from the defendants, if any cargo was landed, to make every effort to bring back as much of it as possible. The result shows that a compensation of 50 per cent. on the value of the vessel alone would not have paid the expenses of the expedition. The large outlay and the expenses required in such expeditions were well known to all the parties, the libelants having but recently made an expedition somewhat similar at an actual loss.

The evidence on the whole, therefore, seems to me clearly to disprove the claim of the defendants that there was any mutual mistake as to the cargo. The amount of the cargo and the precise situation of it were indeed uncertain; but it is manifest that the libelants contracted on the faith that there was a considerable amount of cargo on board; and the telegram as regards a "fair cargo" on sailing from Savanilla, was from a trustworthy authority, not fairly admitting of question or reasonable doubt. Whatever uncertainty there was, was distinctly recognized as existing, and each took the chance of it. Mr. Flood, the agent of the charterer who personally attended chiefly to the negotiations and the making of the contract on the part of the defendants, does not complain of the least unfairness in making the contract; and on the return of the ship he congratulated the libelants not only on their success, but on the amount of cargo which was on board, and the fortunate pecuniary results of the expedition.

2. Amount. As respects the ship, which was fully represented in this contract by the signatures of both her owners and her insurers, there is no reason for disturbing the contract price; for the contract was made not only upon equal terms, but upon the fullest deliberation, and after consultation with others, and as the best thing that could anywhere be done with persons best able to attempt the relief of the ship.

As respects the cargo, though the contract mentions that the libelants, "if successful in delivering the steamer at New York, are to receive 50 per cent. of her value, including cargo, stores, and inventory;" yet the contract is not signed by any persons purporting legally to represent the cargo, or to be interested in the cargo. The libelants knew that they were dealing only with the "agent for the owners" of the Alert and with the "agent of the underwriters of the vessel." There is no language in the "contract," so called, by which either of the defendants undertook to pay this 50 per cent. at all; much less to pay it personally; while there is an express provision that the $2,500 was to be guarantied and paid by Hurlbut & Co., whether successful or not; the guaranty being waived in case of delivery at New York. The fair meaning of this paper, called a "contract," but which in form was only a letter, addressed by the libelant corporation to Mr. Flood, as agent for the marine underwriters, and which he and Hurlbut & Co. afterwards signed at the foot, is not that the latter personally agreed to pay 50 per cent. of the value of the vessel and cargo; but that they, as representing the shipowners and the insurers of

the ship, approved the proposition that the libelants might "receive" or recover for the services which in the paper are called "concerning salvage" a compensation at that rate, i. e. receive or recover it in the usual mode of receiving salvage, viz. by process in rem, if not paid by the interests chargeable with salvage. This paper being fairly made, and being made, as the proofs show, with the knowledge and consent of both the owners and insurers of the vessel, estops them from disputing the recovery of the rate specified as against the hull; but does not, I think, bind the defendant agents personally to pay that amount upon the cargo, any more than if the agents' approval had been expressed by a simple indorsement upon the letter.

I do not find any sufficient reason, however, to disallow the same percentage as respects the cargo; and this for several reasons. Considering the great distance at which the services were to be rendered, the perils, the uncertainties, and the heavy expenses attending it, and the doubts about its success; the rejection already made of a similar offer by the larger Merritt Company, in consequence of these very uncertainties and necessary expenses; the impossibility of obtaining assistance in South America, or of ascertaining precisely the amount, value, or condition of the cargo; the considerable time that must elapse before the Right Arm could reach the stranded ship and get to work; the danger of great injury meantime to whatever cargo was on board, and its great depreciation in case the vessel should have sprung a leak before the Right Arm should reach her, or before she could be got off; and in case of the necessary landing of a part of the cargo, the large local charges, as well as the expenses of recovering and reloading it—all these conditions made the final result such a lottery of chances, as to lead me to doubt whether the contract would not have been a fair and proper one, and as favorable to ship and cargo as could have been procured, even if the precise amount of cargo on board had been known.

But besides this, it does not appear on behalf of the insurers of the cargo, that any steps whatever were taken in their own behalf, or any protest or dissent from this contract expressed or made known by them until after the service had been performed and the vessel had arrived in New York with her cargo safe and sound. Considering the fact, which the evidence shows, of the extent to which this disaster and its general conditions were immediately made known in all the principal maritime ports and exchanges in different countries, it is incredible that the owners and insurers of the cargo, as well as the owners and insurers of the ship, did not have notice of the stranding, and of the danger of the Alert and of her cargo. It is not improbable that the insurers of the cargo knew of the efforts that were making by Mr. Flood, as agent of the insurers of the hull, for the relief of the ship, and that they acquiesced in those efforts. The fact that they took no steps on their own behalf to do anything to save the cargo indicates that they were willing to leave that matter wholly to the owners of the hull or to the master, as the case might be.

Finally, when the Right Arm arrived on the ground, the master, who knew all the facts in regard to the ship and cargo, was shown a copy of this agreement, and acquiesced in its terms, as respects the cargo as well as the ship. As a master, charged with the duty of doing whatever could be done for the rescue of both, he would have been authorized to contract for the salvage of both ship and cargo; and any reasonable contract made by him would have been sustained. The Wellington, 48 Fed. Rep. 475; The Agnes I. Grace, 2 C. C. A. 581, 51 Fed. Rep. 958. The only complaint on his part was, that for the purpose of saving the vessel, the libelants, in the execution of the work, were willing to sacrifice a part of the cargo. There is a dispute on this point; but I do not credit the charge that there was ever any disposition on the part of the libelants' master to throw overboard any part of the cargo, unless that should be found necessary after thorough efforts to extricate the ship. The master acted, as was his duty, in the interest of the cargo, as well as of the ship. He had telegraphed for help. Help came to him on these terms. He was in possession as master still, and had full power to reject it, if he thought best, or to modify its conditions as to cargo. The service and the terms of the contract were evidently acquiesced in and accepted by him.

Looking at all the circumstances, as they existed and were appreciated at the time when this contract was made both as regards the ship and cargo, and the interests, risks and reasonable apprehension of all parties, I think any interference by the court with the enforcement of a contract so fairly and deliberately made and executed as this, would, as a matter of general policy, be productive of more harm than good; and that the contract rates should apply, as they were intended to apply, to both ship and cargo.

Decree accordingly against the Alert, with costs; and for dismissal, with costs, in the suit in personam.

(June 28, 1893.)

BROWN, District Judge. Since the foregoing decision, a further question has been submitted in respect to the mode of ascertaining the value of the cargo, for the purpose of compensation, about which a difference has arisen. The libelants' offer provided that if the vessel were delivered in New York, the libelants should have "half her value, including cargo," etc. The libelants contend that this entitles them to half the gross value of the cargo in the New York market, without any deduction for liens or charges thereon. The matter is to be viewed, however, as a salvage operation; as an endeavor to save what could be saved, and to stipulate for half of what might be realized. The arrangement does not import anything substantially different, as respects cargo, from what it would have been, had the parties agreed that whatever cargo was brought in should be equally divided between the owners and the libelants; and in that case plainly any liens upon the half coming to the salvors must be discharged out of their own half of the cargo; and the same adjustment should be made in regard to the money proceeds. Whatever customhouse duties may be charge-

able on the cargo, or whatever liens there may be for freight or other port charges in handling the cargo, in order to convert it into money, are a charge against the cargo itself. It would be an improper construction of the arrangement to oblige the cargo owners to pay all such liens and charges out of their half of the cargo for the benefit of the libelants. In fact, the value of the cargo to the owners, as it arrives in New York, is not the gross amount which the cargo may ultimately realize; but the amount only which will remain after deducting therefrom the amount of all charges and specific liens. That alone is "the value" of the cargo to the owners, on its arrival at the port. If the owners should abandon the cargo, that is all that they would lose. The net value, therefore, deducting all such charges, is the "value," as I must hold, contemplated in the contract.