THE ICE KING. PETITION OF CORNELL STEAMBOAT CO. Interventions of MORRIS & CUMINGS DREDGING CO. et al.

(District Court, S. D. New York. June 21, 1916.)

1. TOWAGE ⊂⊃11(5)—INJURIES TO TOW—NEGLIGENCE OF TUG PILOT.

The stranding and injury of two barges, which dragged their anchors and went ashore in a gale, held due to the gross negligence of the tug's pilot, who because of standing an extra watch, so that the master could go ashore, and of having become partly intoxicated, went to sleep on duty, and when awakened by the scraping of the tug against a buoy or reef ordered the engines reversed, so that the hawser fouled the propellers and left the tug and tow helpless.

2. SHIPPING ⊂⊃207—LIMITATION OF LIABILITY—PERSONAL CONTRACT—SUFFICIENT CREW.

Where the owner of a tug chartered her by the month to a dredging company, the owner to furnish the crew, there was a continuing personal contract that the tug would be properly manned, and the owner cannot limit liability for loss occasioned by the absence of the master and the intoxication of the pilot left in charge, though it had used due diligence in selecting the crew and had no knowledge of the facts.

3. SHIPPING ⊂⊃208—LIMITATION OF LIABILITY—IMPLIED WARRANTY—FITNESS OF CREW.

Implied warranty of fitness of crew in the charter of a tugboat applies to the condition at the commencement of the voyage, and the unauthorized absence of the master and intoxication of the pilot without the knowledge of the owner are faults in the management of the vessel occurring without his privity.

4. SALVAGE ⊂⊃30—AMOUNT OF AWARD—RESCUE OF STRANDED BARGE.

The owner of a wrecking tug held entitled to $1,000 salvage for pulling from an exposed beach and towing into harbor a stranded barge, valued at about $7,000, where the tug was engaged for about 12 hours on the work, and neither she nor her crew were exposed to any great danger.

In Admiralty. Petition of the Cornell Steamboat Company, as owner of the steam tug Ice King, for limitation of its liability, in which the Morris & Cumings Dredging Company intervened, claiming damages for injuries to two barges occasioned by the negligent navigation of the tug, and the Merritt & Chapman Derrick & Wrecking Company, intervened to recover salvage against one of the barges. Petition for limitation of liability denied, and decree entered against the owner for full amount of damages, and amount of salvage determined.

Kirlin, Woolsey & Hickox, of New York City (J. Parker Kirlin, of New York City, of counsel), for petitioner.

Burlingham, Montgomery & Beecher, of New York City (Chauncey

I. Clark and Ray Rood Allen, both of New York City, of counsel), for intervener Morris & Cumings Dredging Co.

Everett, Clarke & Benedict, of New York City (A. Leo Everett, of New York City, of counsel), for intervener Merritt & Chapman Derrick & Wrecking Co.

SMITH, District Judge (Eastern District of South Carolina, sitting in New York). This is a proceeding for limitation of liability, filed November 5, 1915, under the fifty-fourth rule in admiralty (29 Sup. Ct. xiv), by the Cornell Steamboat Company, as the owner of the steam tug Ice King. Upon the filing of the petition the Morris & Cumings Dredging Company, as the sole owner of the scows M 47 and M 48, filed its claim, setting out that the Cornell Steamboat Company, as the owner of the steam tug Ice King, was indebted to it in the amount stated in the intervention, and alleging further that the Cornell Steamboat Company was not entitled to any limitation of liability under the terms of the statute. The Merritt & Chapman Derrick & Wrecking Company, who claims a right for salvage against the scow M 48, have also intervened, setting up their claim of salvage, and praying that salvage be adjudged them as against the scow M 48. No question has been raised as to the right of the Merritt & Chapman Derrick & Wrecking Company to intervene in this proceeding for such purpose. As the amount of the salvage decreed may be an important element in determining the amount that may be decreed in favor of the Morris & Cumings Dredging Company against the Cornell Steamboat Company, it would seem entirely pertinent that the question of salvage should be also passed upon in this proceeding.

The parties have all appeared, the testimony has been taken on the issues betwen the Cornell Steamboat Company and the Morris & Cumings Dredging Company, and between the Morris & Cumings Dredging Company and the Merritt & Chapman Derrick & Wrecking Company, and the advocates on behalf of all parties have been heard. The issues in the case to be determined divide, first, into the issues between the Cornell Steamboat Company, upon its petition, and the Morris & Cumings Dredging Company, as to whether there was any fault committed in the operation of the steam tug Ice King which would render the Cornell Steamboat Company, as the owner of the steam tug Ice King responsible to the Morris & Cumings Dredging Company, and then whether, the fault having been committed, whether or not the Cornell Steamboat Company is entitled to a limitation of its liability to the value of its interest in the steam tug Ice King and the freight pending, and, second, into the issue as to the question of salvage to which the Merritt & Chapman Derrick & Wrecking Company is entitled.

From the testimony it appears that the Morris & Cumings Dredging Company was engaged in doing some dredging which required the dredged material to be put upon their mud scows, which were then to be towed without the harbor and bay of New York, and emptied or dumped upon what is known as the dumping ground, at a point at sea about two miles southeast of the Scotland Light vessel and between about four or five miles off the shore of Sandy Hook. The Morris &

Cumings Dredging Company was possessed of scows which it used for the purpose of carrying off the dredged material, but it did not possess tugs for the towing of these scows, and it made an agreement with the Cornell Steamboat Company, first to charter a tug called the Bismarck, and then for the charter of the tug Ice King for its towing operations in and about the work. A part of the terms of the charter is shown in a letter dated October 29, 1913, from the Cornell Steamboat Company to the Morris & Cumings Dredging Company, in which the size and capacity of the Ice King is stated, together with the consumption of coal, and it is admitted that the parol agreement made in connection with the representations that this letter made, was that the Morris & Cumings Dredging Company would charter the Ice King for its purposes at a hire of $2,200 per month. The Cornell Steamboat Company was to furnish the tug and all her crew or employés; but the Morris & Cumings Dredging Company was to supply coal and water. The tug Ice King was accordingly put in condition and delivered to the charterer in November, 1913, and continued in its employ until she was wrecked as hereinafter mentioned.

The testimony shows that the Ice King was repaired so as to be, according to the testimony of the witnesses, tight, staunch, seaworthy, and in good condition, and at the same time she was manned by a crew sufficient in number. The testimony is that the general manager of the Cornell Steamboat Company furnished the Ice King with a licensed captain, pilot, and mate, as to whom he made, according to his testimony, due inquiry. In the case of the master, he knew him, as the master had been an old employé of the Cornell Steamboat Company, and that he knew him to be a perfectly competent and capable man, and there is no testimony questioning the competency and capability of this master. With regard to the pilot, he had not been employed by the Cornell Steamboat Company, nor was he known to the manager; but the testimony of the manager is that the pilot, who was named Walsh, was sent to him by a man by the name of Pierce, in whom he had confidence as to his ability in procuring competent and efficient men, and who was acquainted with and had dealings with men engaged in the furnishing of pilots for such purposes. The manager testified that he also made inquiry at the offices of two other concerns which were engaged in towage operations, and in the employment of steamboat masters and pilots, viz. he inquired of one Conner, who was in the office of Moran & Co., and also inquired of some one in the employ of Peter Cahill, also a tug owner, and employer of such officers; that conjoined with this, he made a personal inspection of the man Walsh, who applied for the position of pilot, and being satisfied with what he heard in his favor, as well as with his personal appearance, he engaged him as pilot, and the Ice King, therefore, was manned by a crew and officers supplied by the Cornell Steamboat Company to the charterer.

The Ice King proceeded and performed the work for which she was chartered up to December 24, 1913. On that day she was to carry out two scows loaded with dredged material, to be dumped during the night of December 24, 1913. The master, desiring to be at home with his

family on Christmas Eve, arranged with the pilot that the pilot should remain in charge of the boat and do the master's watch in his absence, thus enabling the master to go home to his family. The arrangement was that the pilot, whose watch ran from 12 to 6, and who had been on service from 12 midnight to 6 in the morning of the 24th of December, and who was to go again on service at 12 o'clock noon of December 24th, should, in lieu of going on service at 12 noon, go on service at 6 p. m. on December 24th and remain on service until at least 6 a. m. the morning of December 25th, thus taking a double watch or period of duty. The evidence is that during the day and up to the departure of the captain the boat was employed on various matters about the harbor, and that the captain left about 7 o'clock p. m., leaving the boat in charge of the pilot, and that prior to that time they had each had at least three to four drinks of beer. There was also some evidence tending to show that the pilot had been drinking whisky and had carried whisky on board with him. The assistant engineer, with the permission of the chief engineer, also left the boat to go home in the afternoon of December 24th, so that the Ice King, when she started to perform her duty of towing the scows to sea on the afternoon or evening of December 24th, was deficient two members of her crew, viz. the master and the assistant engineer.

There was no evidence introduced to show notice to, or knowledge by, the Cornell Steamboat Company that these two members of the crew had left the Ice King without leave; but there was evidence introduced showing that by the rules of the Cornell Steamboat Company no master or pilot or engineer was permitted to leave this boat without first reporting to the steamboat company's office. The pilot took the tug in charge, took up his tow of two loaded scows, carried them down the harbor and through the bay out to sea, arriving at the dumping ground between 11 p. m. and 12 midnight, dumped the loads, and then proceeded to return. On his return the pilot went to sleep in his wheelhouse. The tug and her tow seem to have got completely out of their course. There was no lookout on the deck or in charge of the tug, the lookout whose watch it was to perform the duty was still asleep, not having been called; and while the pilot was asleep in the wheelhouse his vessel either collided with a buoy or thumped and scraped on a shoal, probably the shoal marked on the chart as "oil spot," and the pilot being awakened by the concussion or collision immediately gave orders to reverse, without apparently taking any soundings or knowing whether the order to reverse was proper, and when the order was given and the engines reversed the hawser upon which his tows were hung was slackened, and, falling in the water around the propeller, became involved or entangled in the propeller of the tug, so involved and entangled as to completely wind up and put a stop to all movement on the part of the propeller, and bind it beyond any possibility of extrication at sea where the tug was, so that the tug with her tow lay in a perfectly helpless position at a point which, according to the best testimony, appears to have been in the channel marked on the chart as the False Hook Channel.

Although the wind had not been very heavy when in the evening the

tug started out to the dumping grounds, it had freshened so that at the time of this occurrence it was blowing at a good rate, and, the tug being perfectly helpless through the choking of her propeller, the pilot cast anchor and directed his tows to do the same. The wind increased very much during the early morning, and attained such force with the sea as to compel the tug and her tows to drag the anchors, and finally in the early morning, about 5 or 6 o'clock of the 25th of December, the tug and her tows were stranded upon the sea beach of Sandy Hook, where later in the surf and sea caused by a violent storm the tug was inextricably stranded and broken to pieces, so as eventually to become a total loss. The crew of the tug went from the deck of the tug to the scow M 47, which had been hauled alongside of the tug, and at low water descended from the scow upon the beach, and then walked to the high land, where the pilot proceeded to telephone to the Cornell Steamboat Company's office the news of the disaster. The Merritt & Chapman Derrick & Wrecking Company, hearing of the stranding, came down and brought to the scene of disaster a powerful tug. During the day they carried out a heavy hawser to scow M 48, which was the scow lowest down on the beach, and at high water succeeded in extricating it from the beach and towed it into safety in the harbor of New York, being occupied, in going to the place, and being at the place, putting out the hawser, attaching it to the scow, waiting for high tide, pulling the scow off at high tide, and, towing her to a safe place, for about 12 hours. The other scow, M 47, was by the heavy gale which succeeded the stranding (during which the wind attained great velocity) cast up high upon the beach, whence it was some time later extricated by the Morris & Cumings Dredging Company at a cost of some $6,884.50.

[1] Upon consideration of the whole testimony the court is satisfied that the disaster was due to the gross negligence of the pilot in charge. From his own statements as put in evidence it would appear that he had been drinking, and was probably either under the influence of drink at the time, or in a condition in which the amount of alcohol taken disposes a person to sleep. To this was conjoined the strain of having been on duty for his full term ending at 6 o'clock in the morning of December 24th, and continuing after 6 o'clock that evening for a period after 12 midnight. In consequence of all this he went to sleep, got completely out of his course, was suddenly awakened and frightened by the collision or grounding of the tug, and without due precaution or care reversed his engines, causing the hawser to suddenly slacken and then become involved and entangled with the propeller, rendering his tug helpless. He was then forced to anchor where he was, and thereafter the storm caused his tug to be stranded upon the beach and destroyed. The tug, when it went out to sea on the evening of December 24th, not only was insufficiently manned through the absence of both the master and the assistant engineer, but was in charge of a pilot who at the time was under the influence of drink, and careless and negligent in the performance of his duties, and whose negligence was the proximate cause of the disaster.

[2] The Morris & Cumings Dredging Company insists that for the damage inflicted upon it under these circumstances it should be en-

titled to recover from the owner of the tug Ice King, as the owner is not entitled to a limitation of liability in this case; that under the charter party there was an implied warranty in the nature of a personal contract that the vessel would be tight, staunch, and seaworthy, and furnished with a competent and sufficient crew at the starting of the voyage, and in this case, when the vessel started on her voyage from Brooklyn to tow the scows to the dumping grounds outside of the harbor of New York on the evening of December 24, 1913, she was neither manned by a sufficient crew, nor was she in charge of a competent pilot. The Amos D. Carver (D. C.) 35 Fed. 665; Great Lakes Towing Co. v. Mill Transportation Co., 115 Fed. 11, 83 C. C. A. 607, 22 L. R. A. (N. S.) 769; The Loyal, 204 Fed. 930, 123 C. C. A. 252; Benner Line v. Pendleton, 217 Fed. 497, 133 C. C. A. 349. The charter in this case was a time charter per month. The tug was chartered for the purposes of general use in the bay and harbor of New York, as well as out to sea as far as the dumping grounds. The Ice King seems to have been employed, not only in carrying the scows to the dumping grounds, but also in going to and from different points on the New Jersey shore, the Manhattan shore, and the Brooklyn shore. What constitutes a voyage or separate adventure under these circumstances it is difficult to say.

[3] The charter carried an implied warranty that the Ice King should during the term of the charter (except of course subsequent to any injury caused by any maritime or other peril) be seaworthy and manned and equipped with a competent and sufficient crew. The furnishing of the officers and the crew was the duty and entirely under the control of the Cornell Steamboat Company. From the testimony it appears in this case that the owner of the Ice King, at the commencement of the charter party in November, 1913, had furnished the Ice King with a crew under the charter party, and had used all reasonable and sufficient diligence to put the Ice King in a tight, staunch, and seaworthy condition, and that she was in such condition when she began her service under the charter party, and also when she began her voyage from Brooklyn to the dumping grounds on the afternoon of December 24, 1913. It also appears that the owners had exercised reasonable and due diligence to furnish the boat with a competent, skillful, and sufficient crew at the time of the commencement of the service under the time charter; that the pilot was, according to the information furnished to the owners upon its inquiry, a competent and skillful pilot. It further appears that the absence of the master and the assistant engineer, when the tug started on the voyage to the dumping grounds on the evening of the 24th of December, 1913, was not known to or permitted by the owner of the tug; nor was the condition of the pilot known to it at the time. In other words, the action of the master and assistant engineer in leaving the boat, and the condition of intoxication and the consequent negligence of the pilot, were faults in the management of the vessel which occurred without the privity or knowledge of the owner.

If, however, the contract in this case is to be treated as a personal contract in the nature of a warranty that the crew and officers should

at all times during the continuance of the time charter be sufficient and competent and skillful, then inasmuch as, on the evening of December 24, 1913, the Ice King left for her voyage with an insufficient crew and a pilot in the condition which rendered him neither competent nor capable, that would appear to be a breach of the warranty. Under the principles of the reasoning in the cases above referred to, the rule in this district would seem to be settled by the Circuit Court of Appeals for this circuit to the effect that under a charter party of this kind there is a continuing personal contract of warranty, both as to the seaworthiness of the vessel and as to her proper manning and equipment, and that for damages consequent on a breach of this personal contract the shipowner is not entitled to the benefit of the statutory limitation of liability. This would clearly appear from the reasoning in the case of Benner Line v. Pendleton, as reaffirmed in the later decision handed down by the Circuit Court of Appeals for this Circuit in the case of McCahan Sugar Refining Co. v. Steamship Julia Luckenbach et al., 235 Fed. 388, 148 C. C. A. 650, declaring the rule in this district. The charterer, therefore, the Morris & Cumings Dredging Company, is entitled to a decree against the Cornell Steamboat Company for the full amount of the damages caused to it through the negligence of the pilot and the consequent stranding of the tug and tows. A reference will be ordered to ascertain these damages, and a decree will be entered therefor.

[4] On the question of the quantum of the salvage which should be awarded to the Merritt & Chapman Derrick & Wrecking Company, the evidence before the court is very unsatisfactory. There is no doubt that the salvors proceeded with very commendable celerity to the place of the impending disaster, and were successful in the salvage. There is no satisfactory evidence as to what was the value of the scow M 48, which is one of the essential elements in the percentage to be awarded as representing salvage. The services were performed without any apparent risk whatsoever to the lives of the salvors or to the property engaged in performing the salvage service, which occupied about 12 hours. The fairest inference from the testimony as to the value of the property salved would appear to be about $7,000, and the court holds that under the circumstances of this case, and in view of the fact that, unless the property had been salved, it might have been entirely destroyed by the succeeding storm, a fair salvage allowance will be $1,000, for which amount and costs a decree may be entered up in behalf of the Merritt & Chapman Derrick & Wrecking Company against the Morris & Cumings Dredging Company.