**YOKOHAMA SPECIE BANK et al. v.
MITSUI & CO., Limited.
No. 84.**

Circuit Court of Appeals, Second Circuit.
Nov. 19, 1934.

**AUGUSTUS N. HAND, Circuit Judge, dissenting.**

Burlingham, Veeder, Clark & Hupper, of New York City (John L. Galey, of New York City, of counsel), for Mitsui & Co.

Single, Atkins & Tyler, of New York City (Douglas D. Crystal, of New York City, of counsel), for claimants.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

**L. HAND, Circuit Judge.**

This proceeding arises from a petition to limit the liability of Mitsui & Co., Ltd., owners of the Japanese steamer, Horaisan Maru, for damage to her cargo resulting from her total loss on the bar of Grays Harbor, Washington, on March 4, 1926. The ship, which was bound out for Japanese ports, stranded in crossing the bar, could not be got off and went to pieces some distance from where she

struck. This proceeding was to protect her pending freight, which was $33,000 or more, and to limit her owner's liability; more than twenty of the consignees having filed libels against the owner in personam. The case was tried with inordinate delays—substantially by depositions, most of the witnesses being on the Coast; and the judge found the ship unseaworthy and held her liable, but granted limitation. Whether he held that she was badly navigated across the bar is not wholly plain. Theoretically that might make a difference in the burden of proof. If she was properly navigated, then she need not rely upon section 3 of the Harter Act (46 USCA § 192), and would be liable only in case she was unseaworthy in some way which caused the loss. On that issue the shippers might have the burden of proof, contrary to the judge's opinion. If on the other hand she was badly navigated, the exception in her bill of lading against a strand would not protect her and she must look to section 3 of the Harter Act and prove her seaworthiness. As we think that she proved herself seaworthy anyway, we do not pass upon this question of the burden of proof.

She had come to Grays Harbor from other Coast ports where she had lifted part of her cargo, and she was to fill for Japan with a large consignment of lumber, about a fourth of which was to be stowed on deck. To reach her place of lading she had to go up the Chehalis River some eighteen miles to some dolphins just above the City of Aberdeen. The lumber was brought alongside in lighters and completely stowed by the afternoon of March 3, 1926. She left at about noon the next day, the tide being then two feet above low water, enough, though only enough, to carry her during the early part of her river trip. In fresh water she drew 26 feet forward, 26 feet 3 inches amidships and 26 feet 6 inches aft; that being the greatest draught allowed by a regulation of the port authorities and the underwriters' surveyors. From the dolphins the river runs nearly north but turns more than ninety degrees to the west after a few hundred yards, and flows southwest through two railroad draws in a channel of a dredged depth of twenty-five feet at low water, which had probably silted up considerably in places. After a long bend to the westward this channel passes the Port Commission Dock on the north and continues without much change in direction to Grays Harbor City about ten miles from the dolphins, where it ends; after which the natural channel is deep enough for such vessels as the Horaisan Maru.

The claimants alleged and the judge found that the ship was unseaworthy in two particulars; first she had a list which increased her draught too much for the bar and made her steer unhandily; second, she was instable, due to her deck-load of timber and presumably also to bad stowage. As to the first, she conceded that on leaving the dolphins she had a list to starboard, but only of three or four degrees, which was of no consequence. There can be no doubt that on her way down the channel this changed, sometimes increasing, sometimes disappearing, sometimes reappearing at about what it was originally. At Grays Harbor City the weight of testimony is that the starboard list had given place to a port list, which the ship asserted to have been no more than the original one, but which the claimants believe they have proved to be seven or ten degrees, perhaps even more. A three-degree list would have increased her draught about five inches; a seven-degree list would have made her draw amidships 28' 1"; a ten degree, 29' 1". On February 2, 1926, the government chart gave thirty-one feet at low water over the harbor bar; on April tenth the same; Hansen, the pilot who took the ship out, said that eight days before he had found it to be thirty-one feet. High water on that day was a little over seven feet above low water. The best, really the only, evidence, therefore, is that at high water she had thirty-eight feet of water in the channel. In crossing the bar she struck heavily astern several times and finally became fast. After some unsuccessful efforts to pull her off, which resulted in turning her about ninety degrees to the north, she sank nearly athwart the channel, her stern on the southerly bank. It is impossible to determine her navigation with any certainty. The pilot and the master differ as to whether she went out on a line to the north or south of the ranges; as a sand bank extends out from the southward close to the range, it is probable that she struck on this. For reasons that will appear, it is not necessary for us to decide where she was, though our strong impression is that she was off her course.

The first question is as to her list when she broke ground at the dolphins, the place where her seaworthiness is to be tested. This may be divided into two parts, its effect upon her fitness to navigate the river, and to cross the bar. The utmost list that by any fair consideration of the evidence can be ascribed to her when she left the dolphins is seven degrees, and though this would increase her draught by nineteen inches, there is no reason to suppose that this made her unseaworthy in the river. She had a helper tug, was proceeding at low speed in smooth water, and could safely touch the soft bottom, as probably she did; there was water enough to scratch through, even if she drew twenty-eight feet. Again such a list did not seriously affect her steering ability. Jack, the claimant's expert, thought otherwise, but he was contradicted by seven experienced masters and one expert, and we cannot accept his opinion alone on a question where experience counts for more than the greatest theoretical proficiency. Her sheers and other difficulties are to be laid down to the narrow channel, the sharp bend, the draws of the bridges and the fact that she was often "smelling" or touching bottom. She was safe, if stable, to reach the bar.

It is true that her original list increased after she left, something not important except as it reflects on her original condition. As the claimants insist that it does, we take up the evidence. At about the bridges her engineer thought it best to ask the master whether he might shift some coal to the port side. Thinking that this might not be enough, he ordered his assistant to slacken a bilge tank below the engine room, No. 3, which had a fore and aft section. He meant to slacken only the starboard side, which would give the ship an added righting moment, but his assistant misunderstood the order and slackened the "dry tank," just forward of No. 3, which had no fore and aft section. The result was to increase the list to starboard, as must always happen when a thwartship tank is slackened on a ship already listed. The error was not discovered for some time, so that by the time the "dry tank" had been pressed up, so much coal had been shifted—some twenty-five tons over a distance of thirty feet—that the list had been over corrected and appeared as a port list of about the same amount. This was at Grays Harbor City, where the dredged channel ended, and that list the ship carried over the bar. This whole story is a very suspicious one, and we should thoroughly distrust it were it not that we can find no other explanation for what happened. As the cargo did not shift and the ship was not instable (as we shall show later), only the ballast or the coal or both could have changed the list from one side to the other and kept it permanent. The original increase in the starboard list, observed by many witnesses, is thus accounted for and nothing else seems to us to do so.

There remains the question of the original list so far as it affected her ability to cross the bar. We are here to disregard the increased list unless we attribute it to some fault when she broke ground; indeed we must disregard it anyway for she crossed the bar with quite another list. But the whole question of her trim appears to us irrelevant to her seaworthiness, at least after she got through the dredged channel; it was a part of her management, as much as the trim of her ventilators, or the closing of her hatches or ports. A ship need not be fit in all respects for all that she must meet on her voyage if she is equipped for any necessary adjustments, when she breaks ground. The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; Steel v. State Line S. S. Co., 3 App. Cas. 72, 90; The Steel Navigator, 23 F.(2d) 590 (C. C. A. 2); The Mexican Prince (D. C.) 82 F. 484, affirmed on opinion below (C. C. A.) 91 F. 1003 (C. C. A. 2). Cf. The Niagara (D. C.) 77 F. 329. The exception that the defect must be known to the crew, assumes the doctrine in chief. International Navigation v. Farr, etc., Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The President Polk, 43 F.(2d) 695 (C. C. A. 2). Those decisions which require only enough bunkers to reach the first port of call, are again an instance of the same rule. The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491. That in the case at bar the crew had means to right the ship is demonstrated by the fact that not only did they bring her in trim but they fetched her over to port. Nothing could be more clearly a matter of management. They could even have redeemed that error by a reshift of the coal, or by using tank No. 3. There was no need to fill a tank; nor indeed would it have served to do so, for the only empty tanks ran thwartships. Had they slackened the No. 3 tank, it would not have affected her stability which depends upon her centre of gravity, given the same dead-weight and the same stow; forty tons in a total dead-weight of 8,600 was negligible. We conclude that if she was unseaworthy, it was because she was instable.

The ship attracted an altogether unwonted amount of attention almost from the time she left the dolphins, and this was the reason for the inference, natural enough after the event, that she was not fit to sail. Nevertheless, her crew, her pilot and Clarkson, the port surveyor, who superintended her lading, though they acknowledged that she had a list, all insisted that she was not instable. She had been laded in the usual way by experienced stevedores and under competent supervision. A customary test of stability had been applied to her during the stowage; it was to see how much she yielded when a draught of one or two tons was raised from a lighter alongside, or when four such loads were raised together; these tests she properly resisted. Her deck-load, so far as can be estimated, was about nine hundred tons, and was stowed only ten feet high; she had safely lifted more on other voyages, and the stowage was stopped only because her draught had to be kept to the prescribed limit. Two masters, called by the claimants as experts, said after examining her plans and stowage plan that she had been properly stowed, which necessarily included her stability. Thus there is much antecedent reason for supposing that she was stable. It is quite true that a deck load of lumber does make a ship somewhat tender, but that has its advantages, and some masters prefer it so. The resulting freeboard makes the roll slower and diminishes the danger of spilling the load. The essential stability of the ship is not imperiled. No doubt the single most important factor is the ship's metacentric height, and that cannot here be calculated. Hansen, a naval architect for the ship, did give her a positive height of eighty-five hundredths of a foot, concededly enough; but Jack for the claimants would not commit himself, and we agree that too many factors enter into the result. We can be reasonably sure, however, that she did not have a negative metacentric height, though that would not necessarily have condemned her.

The claimant's opposing testimony may be divided into three parts, that of the tug, "Tyee," which saw the ship through the bridges; that of the ship, "Sujerseyco," which crossed the bar about half a mile ahead of her, and saw her take the strand: that of several witnesses who saw her or followed her on her trip down the river as far as the Port Commission Dock. The crew of the "Tyee" were disposed to account her an ill-found ship, having had trouble with her in going through the bridges, which went so far at one time that the pilot let go the anchor. Nevertheless, although they did indeed at times see her change her list from one side to another, their testimony may be reconciled with her "smelling the bottom," or going actually ashore. A mere change of helm when a ship has little water under foot will apparently cause a list and it is extremely probable that at times her bilges actually scraped on the mud. To take up these witnesses in detail, Miller, the master, swore that the ship lolled back and forth several times, from which he

concluded that she was "tender," as she probably was. He did not say that she was so instable as to be unseaworthy; and there is no reason to think that he would have said so. His testimony is consistent with the explanation we have just given. Biberger, the mate, was non-committal; the West Bridge was the only place where she changed her list and then she did not swing over to port, but back to starboard. If he is right, she probably took the ground at that place, or perhaps hit the abutment, though he thought not. Stone, a kind of deckhand, at first swore that she lolled from side to side several times, but on cross-examination he could remember only one instance and that when she was passing a bridge. Petersen, the engineer, told a very different story on the stand from what he had given shortly after the accident; his testimony cannot be depended upon. Thus it is apparent that the crew as a whole proved nothing of any moment upon the issue of stability.

The testimony of the "Sujerseyco" is equally unpersuasive. Some of the crew profess to have seen the ship loll back and forth as she steamed behind them and crossed the bar; but all the evidence of the ship herself is to the contrary. It is of course possible that while passing the bar and meeting the seas which always come in over it, she gave the appearance of swinging back and forth, and she undoubtedly caught their attention for some reason; perhaps because the port list was more than seven degrees. But in any event their memories were not faithful records, for they did not agree. The first and second mates, Hayes and Vesey, said that the port list which she had when they first saw her, never changed. Although the judge saw one of the "Sujerseyco's" crew—the only witness to the event whom he did see—we are not minded to take their word that the ship was instable.

There remain the occasional witnesses who saw her on her way down the river as far as the Port Commission Dock. Clarkson was eating his lunch in the City of Aberdeen when Peters, the port manager, who had seen the ship probably as she was passing the bridges, came in to tell him, not that she seemed instable, but that she had too heavy a list to starboard. Clarkson stopped eating, and with Spicer, his assistant, drove to the dock, where he could hail the pilot as he passed. She had very substantially increased her list since leaving the dolphins, and Clarkson got an assurance from the pilot that she would be trimmed before she crossed the bar. In

this we can find no evidence of instability. Dean was the head stevedore; Johansen was the head checker of the line; both had supervised the loading and both followed the ship in a motor car along the shore to below the Port Commission Dock. They each speak of the starboard list and of its increase after she left the dolphins. Johansen suggested that they follow the ship down, lest she "tear anything to pieces" down at Wilson's Mill, a remark which the claimants seek to use as evidence of the ship's unfitness. In its context that hardly seems fair; there were a number of scows and the like which she must pass at that spot, and which a vessel of that size and in such a narrow berth might damage. The testimony of these witnesses does not in any case impugn the stability of the vessel, though it no doubt contributed to the general impression against her. Of the other witnesses, Stephanson, Puffer and Wilson saw her from the shore; she was listed to starboard so much that they became interested and thought her in bad condition. But she did not swing over to port, though Puffer saw her right herself when passing a bridge and list back again after she got through. Ahlman was on a tug passing her on his way upstream; he saw her original list to starboard which changed to port after she had passed through the first bridge, and then back to starboard and once more to port. That testimony certainly fits only a vessel which was thoroughly instable and if believed would establish the claimants' case. But it is contradicted by all the other witnesses who saw her through the bridges. Moreover, these contradict each other; sometimes the list is to port, sometimes to starboard; sometimes the ship rights herself to fall back to her original list. Such testimony is a broken reed; it may show that the vessel had something unusual about her, as undoubtedly she had, but it throws no light upon her stability. Similarly of the testimony that she shifted from one side to the other at the dolphins as stated by Tolvstad and some of the "Tyee's" crew. While a ship is at her berth being loaded, she may list from side to side with impunity.

There is but one other bit of evidence which we need discuss; the report made by one Logan, which was annexed to a general average statement of Johnson & Higgins, who acted as adjusters. Whether this was ever admitted in evidence does not appear; it was not competent unless accepted by the ship, which it was not. The claimants argue that an average statement is legally the work of the master and that as such the owner is

bound by it as an admission if he employs a professional adjuster. That is a position we need not discuss, for even were it sound, it should certainly not cover any reports of how the loss occurred, which the adjuster chose to annex to the adjustment proper. Logan was the Special Surveyor of the London Salvage Association, whatever that may be; he may have represented the owner, or he may not. Clearly he got his information at second hand and probably from those very witnesses who were examined in this record. He did say that the original starboard list was as much as twelve degrees and that the ship lolled from side to side, but for the reasons we have given, the last was extremely unlikely. Naturally he thought the ship instable; but his chief reason for that apparently was that when aground the ebb tide on her starboard side capsized her. Nobody else has suggested anything of the kind, and in fact she was pounded by the seas and driven back on her course before she finally sank. Having a port list when she struck she kept one to the end, and there was no evidence of her instability, so far as appears. Thus even if the report were competent, we should not rate its value high.

Our conclusion is that when the ship left the dolphins—broke ground—she had a list of no more than seven degrees, probably not so much. That this did not seriously affect her fitness to pass through the channel to the bar. That so far as it affected her fitness to cross the bar, it was matter of trim, and that trim is a varying function of the ship and part of her management, assuming her crew can right her by means aboard. That the increase in her list after leaving the dolphins was as such irrelevant to her seaworthiness, which speaks as of the time of breaking ground; and that so far as it may reflect back upon her condition at that time, it adds nothing. That she was stable enough for her voyage, though probably somewhat tender. That she has therefore excused herself whether she left the channel or not.

Decree reversed; claims dismissed.

AUGUSTUS N. HAND, Circuit Judge (dissenting).

In view of the large amount of testimony by eyewitnesses tending to support the decree, I am not satisfied that the trial judge was wrong in finding that the vessel was unstable. When she left the dolphins, she was loaded to the extent permitted by the port regulations and had felt obliged to reject further cargo for that reason. She had to suffer this deprivation because of the restriction of her draft of 26 feet, and she could not fill her ballast tanks to deepen her draft and insure proper stability inasmuch as her draft was already 26 feet at the time she broke ground.

When the ship reached the bar, she may have stranded either because her pilot got out of the channel or because heavy breakers that frequently come in from sea at that point swung her from her course. But her instability and the list which she could not correct owing to her inability to fill her tanks rendered her unseaworthy. The list increased her draft substantially and added to her difficulties in crossing the dangerous bar. She should have had clearance enough to avoid stranding even though she got slightly out of the channel when crossing that unsafe place. When the port authorities fixed a maximum draft, it ought, I think, to be regarded as a standard of what was necessary for seaworthiness at the bar. A failure to conform to this standard, in my opinion, rendered the vessel unseaworthy unless the list and instability were correctible, and I do not think that they were or the ship would not have caused so much comment all the way down to the bar in spite of the attempts of her crew to get her in stable condition. Whether or not the stranding was primarily due to errors of navigation, there was a warrant for finding that the vessel was unstable and had a bad list which could not be removed.

While it may not seem worthwhile to dissent in respect to a pure question of fact, I do so because I think we ought not to reverse an experienced trial judge who has been through this long record without clearer warrant than appears to exist.

I think the decree ought to be affirmed.