**DAISY PHILIPPINE UNDERWEAR CO. et al. v. UNITED STATES STEEL PRODUCTS CO. and fifteen other cases.**

District Court, S. D. New York.
April 16, 1935.

Bigham, Englar, Jones & Houston, Henry N. Longley and Alfred Ogden, all of New York City, for cargo-owner libelants and general average respondents.

Kirlin, Campbell, Hickox, Keating & McGrann, W. H. McGrann, J. Harvey Turnure, and E. F. Gilligan, all of New York City, for United States Steel Products Co. and steamship Steel Scientist.

Carter, Ledyard & Milburn, Rush Taggart, and H. Henry Ramm, all of New York City, for Atlantic Mut. Ins. Co.

GODDARD, District Judge.

These suits resulted from the stranding on April 13, 1926, at 11 p. m. of the steamship Steel Scientist on a small rocky island known as Farallon Sucio located off the Eastern Coast of Panama, some 24 miles from the Atlantic entrance to the Panama Canal.

Included are fifteen libels filed by the various owners of cargo shipped on the Steel Scientist to recover for the loss of and damage to their cargo, and one libel filed by the United States Steel Products Company against a number of underwrit-

ers who executed general average guaranties to recover contributions in general average alleged to be due from cargo. All cases were consolidated for trial which took place in June, 1934, and the cases finally submitted on December 6, 1934. By agreement of the parties and with the approval of the court it was stipulated that the libelants should not be required to offer proof of compliance with the bill of lading notice of claim provision, where that provision is applicable, prior to the determination of the merits of the litigation.

The Steel Scientist is a steel vessel built in 1921 by the Federal Shipbuilding Company in Kearney, N. J., and was owned by the United States Steel Products Company. Her general dimensions are about 441 feet over all, 56 feet beam, 38 feet in depth, with a loaded mean draft of about 26 feet, and was operated by her owner as a general cargo carrier trading from the Atlantic Coast to the Far East.

On February 26, 1926, the Steel Scientist returned from a six months' voyage around the world, having sailed from New York through the Panama Canal to various Far East ports and returning through the Suez Canal. After discharging her cargo, she was dry docked and overhauled in preparation for this voyage to the Far East, which began in Philadelphia on March 10, 1926, and terminated at Philadelphia on November 27, 1926, during which she met with the disaster. After loading cargo at Philadelphia, she sailed from there on March 25 for Boston, Mass., where she arrived on March 27, and after taking on more cargo, left on March 29 for New York, arriving there the same day. Her loading was completed on April 6, and at 7:24 a. m. she sailed from New York for the Far East by way of Crooked Island Passage, Bahama Islands, and the Panama Canal. Her draft was then 25 feet, 10 inches. On April 10, at 9:25 a. m. the San Salvador Lighthouse was passed abeam. Continuing through the Crooked Island Passage she was off Navassa Island Light at 6:23 p. m. the following day—April 11. Her observed position at noon on April 13, as shown by her log book, was latitude 11° 26′ north and longitude 78° 47′ west. There was a straight course from this position toward the entrance to the Panama Canal of about 207° true, and the entries in her log book show that this course was held up to 10 p. m.

At 8 p. m. Third Officer Walton relieved Chief Officer Guilfoyle on the bridge. At this time the Steel Scientist was on a course 207° true and the weather clear with a smooth sea. At 8:25 p. m. Isla Grande Light (Manzanillo Light) was sighted. At 10 p. m., according to the testimony of Third Officer Walton, a red flashing light that turned out to be Farallon Sucio was picked up, but this is denied by Capt. Busch and the log book contains no mention of this light being sighted at this time. However, at 10 o'clock the course of the Steel Scientist was changed to 220° true, which would set her track further away from Isla Grande Light, and it is difficult to explain this change of course, except upon the theory that the light on Farallon Sucio was sighted at that time or shortly before. At 10:35 the Isla Grande Light was abeam, and according to Walton's observation was then distant 7.4 miles and bearing 130° true from the vessel. Capt. Busch's testimony is that at this time he went below and that ten minutes later a red light was reported to him and he returned to the bridge, and when he reached there the red light was pointed out to him; "it was just a flash when I first saw it"; that following his sighting of this red light (Farallon Sucio) he went into the chartroom, looked at the chart, and there was no red light on the chart between Isla Grande and the breakwater; that he did not look at the "Light List" because "it could just have been the red light of a steamer"; that he went to the bridge and Walton told him he thought it was a "red flash light" and he ordered Walton to take a bearing of it, and returned to the chartroom; that on obtaining the bearing from Walton he laid it out on the chart, assuming that the red flashing light was that on the West Breakwater, and found that this set the vessel too far out.

Capt. Busch's testimony confirms a statement in his report to the local inspectors that the light on Farallon Sucio was first taken for the light on the breakwater. But he testified that he was convinced after laying down on the chart the two bearings, (a) the flashing red light, and (b) the Isla Grande Light, that this red light could not be the light on the breakwater; that this vessel would be too far out of range to see the light on the breakwater; also that he knew that this light was "one flash," and that the light on the breakwater was a "double flash." Nevertheless, he

"told him (the man at the wheel) to haul in toward the light to get a better view of it." He also said that he knew Farallon Sucio was over in the direction in which he headed. The engines were continued at full speed ahead which was about 11 knots. This change of course placed the vessel on a course of 150°, an alteration of 67° or six points (220° minus 153°). Capt. Busch says that he again returned to the chartroom and shortly afterwards Walton reported land ahead, whereupon he ordered the wheel hard aport and the engines full speed astern; very soon thereafter the vessel struck. The log book contains this entry: "10:35 P. M. Manzanillo Lt. abeam distant 7.4 miles. Saw flashing light on port bow bearing 178° taken for Colon Breakwater and steered for it."

Capt. Busch's report to the local inspectors includes the following: "10:35 p. m. Passed Isla Grande Light bearing 130 true, estimated distance of 7.4 miles, course 220 true. Soon after, saw a red flashing light on the port bow at times disappearing. This light first taken for the light on Colon Breakwater, and ship hauled in for it."

Capt. Busch testified that when he saw this flashing red light and did not know what it was, he looked at the chart and at the "American Light List" and saw no mention of this light. He said that it was his practice to use the American Light List instead of the British Light List, but at no time before the stranding did he look at the Supplement to the American Light List and did not examine the "Sailing Directions" (H. O. Pilot Book), nor did he examine the British Light Book with its Supplement, all of which were in the rack near the chart table, and which he admits would have informed him of the new light on Farallon Sucio.

Walton's testimony is that about 10:56 he asked Capt. Busch to come out on the bridge and as they stood on the bridge looking ahead, " * * * I says 'There are rocks ahead, Captain', and he stood there and didn't say anything, and finally I said 'Hadn't you better stop her', and I just reached over and grabbed the telegraph and he said 'Yes, full astern'. I give it full astern, was around 10:58, and he said 'Hard aport', and just at that time she got swinging good, he said 'Hard astarboard,' he put her hard astarboard, and just as the clock struck 11, why she struck on the rocks."

Mansell, the engineer, who was on watch, testified that he received the stop bell from the bridge at 10:58 p. m. followed by a repeated order for full speed astern. This is confirmed by the engine room log book, an entry in it stating that "at 10:58 p. m. ship went ashore."

The wheelman testified that he heard a man on lookout shout at 10:55 or 10:56 "breakers ahead," and the wheelman placed the time of stranding as "about 11 o'clock."

The Steel Scientist was stranded on the outlying rocks and shoals of Farallon Sucio and it became necessary to employ salvors to save the vessel and cargo. These operations were started on the following day and were continued by the salvors (Merritt & Chapman Company) until 4:20 p. m. on May 2, when the vessel was floated, and on the night of May 3 was convoyed into Colon where the cargo was discharged and reconditioned and the vessel, after being temporarily repaired, proceeded to dry dock at Balboa on the Pacific side on May 13. On June 9, after the repairs necessitated by the stranding had been completed, the Steel Scientist returned to Colon, reloaded her cargo, and on June 17 proceeded on her voyage bound for Honolulu.

When the Steel Scientist sailed from New York on her voyage, she carried 460 charts which covered all the waters through which she would navigate. The testimony is that at the time of the stranding two charts were being used. H. O. Chart No. 5258 issued by the Hydrographic Office of the United States (6th Ed., April, 1925) having stamped on its face a notation that it was corrected through notice to mariners No. 23 of June 6, 1925. This is a large scale chart extending from latitude 9° 41' north and including to the south the Atlantic entrance to Panama Canal; and H. O. Chart No. 945—a small scale chart showing the east coast of Central America and the Isthmus of Panama with the Atlantic and Pacific sides. The chart No. 5258 which was testified to as being in use at the time of the stranding was not produced, but the testimony is that it was a duplicate of chart No. 5258 which was offered in evidence.

On October 30, 1925, a light had been established on Farallon Sucio, but it had not been marked on either of these charts. However, there were three publications in

the book rack of the chartroom of the Steel Scientist containing the information that a light had been installed on Farallon Sucio.

1. The 1926 "Supplement to the Lights & Tides of the World." The Supplement was the current issue supplemental to the main volume of "Lights & Tides of the World" published in London and known as the "British Light List" or "Red Book." This Supplement had been placed in the main volume and alongside the note in the Supplement that a red light had been established on Farallon Sucio, a cross in red ink had been made.

2. Supplement to "H. O. No. 130 Central American and Mexican Pilot East Coast 1920" published by the United States Hydrographic Office and generally referred to as the "Sailing Directions" or "H. O. Light List." A reference to the Farallon Sucio in this Supplement had been cut out and the slip pasted on page 91 of the book directly under the descriptive part referring to Farallon Sucio, and reads as follows: "Light.—A flashing red light, 100 feet above water, visible 10 miles, is shown from a pyramidal skeleton tower 20 feet in height on the highest point of Farallon Sucio." (N. M. 47 (4197) 1925). "H. O. 130," although dated 1920, was the current and latest issue, the next issue not being published and available until 1927.

3. Notice to Mariners, No. 47, page 1323, Item No. 4197, stating that a red "flashing" light had been placed on Farallon Sucio. This particular Notice to Mariners was included in a group of pamphlets consisting of some 900 pages published by the government.

The Supplement to the "Lights & Tides of the World" and the Supplement to the "H. O. Light List" and "Notice to Mariners" for the "American Light List" are issued at frequent intervals between the publications of the main volume as the occasion requires, for the purpose of supplying mariners with the latest information as to recently established lights, etc. They were obtained by the Second Officer pursuant to the instructions of the vessel owners and were taken on board the Steel Scientist the day before she sailed, although at the time she embarked on her voyage no notations had been made upon the charts of new lights established or other information contained in the Supplements or Notices to Mariners. These books with their Supplements and the Notices to Mariners were kept in a rack in the chartroom near the chart table.

Libels on behalf of cargo interests allege delivery of merchandise in good order and condition for shipment on the Steel Scientist at the various ports of destination and failure to deliver the merchandise in the same good order and condition, or in wholly failing to deliver parts of said merchandise, and claiming damages in specified sums.

The answers filed on behalf of the United States Steel Products Company, as owner of the Steel Scientist, by way of defense, admit delivery of certain merchandise for shipment and carriage to destination, and allege that the vessel stranded on April 13, causing the flooding of the cargo compartments and that any damage to or loss of cargo was due to errors and faults in navigation, although respondent had exercised due diligence to make the Steel Scientist in all respects seaworthy, and she was in fact seaworthy at the time of sailing; and, moreover, that liability does not attach to the respondent because of the conditions and exceptions contained in the contracts of affreightment, which conditions and exceptions are set forth in detail, in so far as they are now pertinent, and are as follows:

"1. That the Carrier shall not be liable for loss or damage occasioned by perils of the sea or other waters or dangers of navigation of whatsoever kind * * * by stranding * * * by defect in any part of * * * appurtenances of the vessel; by unseaworthiness of the steamer whether existing at time of shipment or at the beginning of the voyage, provided the Owner has exercised due diligence to make the steamer seaworthy. * * *"

2. Incorporation of the provisions of the Harter Act, i. e., Carriers' Act of February 13, 1893 (46 USCA §§ 190–195).

The libel of the United States Steel Products Company proceeds against the insurance companies who had guaranteed the payment of all general, salvage, "and/or" special charges for which cargo insured by them should become liable, and the amount of contributions due from each of the insured cargo interests having been set forth in the Statement of General Average prepared by Messrs. Marsh and McLennan.

The answer of the respondent insurance companies admits the sailing of the Steel Scientist with cargo as described

in the libel, and that the vessel stranded on April 13, and subsequently completed the voyage, but denies that the stranding resulted from negligence in navigation by the master, and denies that the owner exercised due diligence to make the Steel Scientist seaworthy, and alleges that the respondents are not liable under their guarantees to contribute to the general average and salvage expenses incurred.

The United States Steel Products Company offered evidence tending to establish that the hull and machinery of the Steel Scientist was seaworthy when the vessel sailed, and there being no evidence to the contrary, it must be granted that the Steel Scientist was seaworthy in these respects.

The claim of unseaworthiness, which the cargo interests urge and rely upon, concerns the navigational equipment of the Steel Scientist for a voyage from her ports of loading to the Far East via the Panama Canal; in particular, that she was unseaworthy in respect to her charts, "Light Books," and "Sailing Directions" for the voyage which she had undertaken.

The cargo interests contend that because the chart for the waters adjacent to the eastern entrance to Panama Canal and in use at the time of the stranding was not corrected before sailing or notations made upon it so as to show the existence of the light which had been established on Farallon Sucio some five months previous, the chart was defective and the Steel Scientist was inadequately equipped and therefore unseaworthy.

The issues presented are as follows:

1. Was the stranding of the Steel Scientist and resulting damage caused by faults or errors in navigation or in the management of the vessel?

2. Was the Steel Scientist in all respects seaworthy and properly manned, equipped, and supplied?

3. Did the owner, United States Steel Products Company, exercise due diligence to make the Steel Scientist seaworthy for the voyage?

■■ It appears from the stipulation and proof that the merchandise was delivered to the respondent, a common carrier, in apparent good order and condition; that each of the shipments sustained some damage or loss while on board the Steel Scientist as a result of her stranding so that the libelants have established prima facie the liability of the respondent. Clark et al. v. Barnwell et al., 12 How. (53 U. S.) 272, 13 L. Ed. 985; The Rosalia, 264 F. 285 (C. C. A. 2). And as respondent was a common carrier, it may not by contract exempt itself from liability for the loss or damage to cargo resulting from the negligence of its employees. Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788; The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969.

■ The respondent may avoid liability only by proving that it is entitled to the benefit of the exemption provided under section 3 of the Harter Act (46 USCA § 192). These exemptions are specifically conditioned on the exercise by the vessel owner of due diligence to make its vessel "in all respects seaworthy and properly manned, equipped, and supplied." Before the vessel owner can secure the benefit of the exemption, it must prove compliance with the condition by establishing that its vessel was in all respects seaworthy at the time she sailed for the intended voyage, or that the owner used due diligence to make her seaworthy. The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; International Navigation Co. v. Farr & Bailey, 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830.

■ It is also true that if the vessel was in fact unseaworthy when she sailed from her port of loading because of the lack of due diligence on the part of her owner, no exemption under section 3 of the Harter Act will be allowed such owner whether or not there is any causal relation between the defect and the disaster. May et al. v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft (The Isis) 290 U. S. 333, 54 S. Ct. 162, 78 L. Ed. 348; The Wildcroft, supra.

Accordingly, whether or not respondent's contention that the actual stranding of the Steel Scientist was the result of faulty navigation be true is of no avail if the vessel was in fact unseaworthy when she sailed as a result of the lack of due diligence of her owner to make her seaworthy. The respondent's liability depends upon its showing that the Steel Scientist was seaworthy when she sailed or that respondent used due diligence to make her so.

The issue as to unseaworthiness narrows down to the question whether the vessel owner provided adequate equipment or sources of information to enable her navi-

gating officers to inform themselves as to the character and location of the recently established light which they observed but did not recognize. Such means of information were at hand. An examination of the "Sailing Directions" (H. O. No. 130) relating to the waters adjacent to the entrance to Panama Canal, page 91, with the slip which had been pasted in, would have informed any one looking at it that a light had been recently established on Farallon Sucio and its characteristics. Or had the navigating officers looked at "Lights & Tides of the World" (British Light Book) with its Supplement, which was inserted in the front of the book itself, a red cross would have been observed on the Supplement opposite the note that a light had been recently placed on Farallon Sucio; or had those in charge of the navigation of the Steel Scientist examined the Notice to Mariners, they would have information about the light on Farallon Sucio. An examination of either the Sailing Directions, page 91, which relates to waters adjacent to the entrance to the Canal, or of the British Red Book, with its Supplement, would have taken but little time, although it would have taken a little longer to consult the various Notices to Mariners and locate the item relating to Farallon Sucio. The purpose of these Supplements was to supply mariners with information regarding new lights which are established and changes which take place in the intervals between the publication of the books containing the light list. The officers of the Steel Scientist knew that these Supplements and the Notices to Mariners had been brought on board the day before sailing and knew why, and that they were intended for use in navigating the vessel. These were well-recognized sources of information used customarily by navigators in locating and familiarizing themselves with the establishment and character of lights. The informative navigational equipment on board was undoubtedly amply sufficient to enable a mariner to conduct the safe navigation of the vessel.

That the officers in charge of the Steel Scientist's navigation should deliberately change her course and head for the red light—a well-known danger warning, as they did, is inexplicable, for although it was, when first sighted, probably thought to be the light on the breakwater at the entrance to the Canal, they were later, and before the stranding occurred, convinced that it was not. And why in their uncertainty they neglected to consult the Light Books with their Supplements which were at hand and had been brought on board for the purpose of informing them of any newly established lights is amazing. No reasonable explanation for their failure to do so has been made and probably none can be given.

The light on Farallon Sucio had a radius of 10 miles. There is a conflict in the evidence, but I think that the probabilities support the conclusion that it was first sighted at 10 o'clock when the vessel's course was changed to 220° true; and it is admitted that at 10:35 the light was observed so that there was ample time before the stranding, which occurred at 10:58 o'clock, to consult the Light Books and Supplements.

If an owner provides his vessel with the informative equipment, such as charts, Light Books, Supplements bringing them up to date, reasonably sufficient to conduct the safe navigation of the vessel, and the information is supplied in such form as to be available to the navigator with a fair amount of effort, the vessel is not unseaworthy in this respect, in my judgment. The fact that the navigator may find it necessary to consult both the chart and the Light Books to obtain the complete information desired does not, under ordinary circumstances, indicate that the owner has failed to equip properly his vessel, although in most instances it might be more convenient if the establishment of a new light was noted on the chart itself. A number of experienced mariners testified on the question. Some took the position that proper practice required that all lights recently established in the waters of the intended voyage should be noted on the charts before leaving port. Others said that the usual plan was to provide the vessel with necessary Supplements to bring her charts and Light Books up to date, and that usually these were not obtained until about the day of sailing in order to have the latest information; and that those in charge of her navigation would either make notations on the chart from the Supplements, or consult the Supplements as the occasion required during the voyage.

A book of "Rules" issued by the respondent for the use of its ships' officers provide:

Paragraph 110: "The ships of the Company are to be navigated according to charts supplied by the Management, to-

gether with all requisite books of sailing directions, light lists, tide tables, etc. Commanders are required to see that these are kept constantly up to date."

Paragraph 199: "The Second Officer must see that all charts are clean and tidy, that the necessary charts are made out and ready for use, and returned to their proper drawer when finished with. If necessary he must visit the Hydrographic Office just prior to each sailing day and obtain the latest weather charts and information available. HE IS ESPECIALLY CHARGED WITH SEEING THAT THE SAILING DIRECTIONS, LIGHT LISTS, etc., ARE KEPT UP TO DATE AND THE HYDROGRAPHIC OFFICE CORRECTIONS PASTED IN AT THE PROPER PAGES." (Words capitalized so appear in the rule book.)

"Rule Books" or "Regulations" of several steamship companies were introduced into evidence, containing rules requiring that charts, light lists, and "Sailing Directions" should be corrected "up to date." Just what is meant by "up to date" is perhaps not clear; none state "before sailing." Portions of a number of text-books and manuals were read into the testimony in which the importance of keeping the charts corrected "to date" was stressed. One of them advised that charts should be "corrected down to time of sailing." These represent at the most but the opinions and advice of the authors and cannot be said to establish a general custom or fix a standard of seaworthiness.

The officers of the Steel Scientist knew that on the day of her sailing the Supplements to the American Light List, to the British Light List, and to H. O. No. 130 (sailing list) had been brought on board for the purpose of providing information regarding new lights, etc., which had been established. Whether notations of new lights were made upon the charts it seems to me was generally a matter of convenience of the navigating officers themselves. The owner had provided the information. It was at hand, ready, and intended for use. If these officers preferred to use the charts and not the Light Lists, with their Supplements when navigating, they had ample opportunity to make notations or adjustments upon the charts. This placed no undue burden upon her navigating officers. The owner supplied the vessel with the navigational equipment (including information or material for correcting the chart) with which an ordinarily intelli-gent and careful navigator might safely navigate her. This the owner was bound to do. The duty of the vessel's navigating officers was to make reasonable use of it during the voyage. They failed to do this. This was a fault or error in navigation or in the management of the vessel as distinguished from a failure on the part of the owner to equip properly and make her seaworthy. The Carisbrook (D. C.) 247 F. 583; Hanrahan v. Pacific Transport Co., Ltd., 262 F. 951 (C. C. A. 2); The British King (D. C.) 89 F. 872, affirmed (C. C. A.) 92 F. 1018.

Section 3 of the Harter Act (46 USCA § 192) affords the owner exemption from cargo claims resulting from faults or errors in navigation or the management of the vessel, provided the owner had used due diligence to make the vessel seaworthy.

Conceding that the captain and navigating officers of the Steel Scientist conducted her navigation when approaching the Panama Canal in a negligent and unskillful manner, this one circumstance does not signify that they were incompetent in view of their previous records. The Elton, 142 F. 367 (C. C. A. 3); Southern Pacific Co. v. Hetzer, 135 F. 272, 1 L. R. A. (N. S.) 288 (C. C. A. 8), and their previous records are such as to relieve the owner of the charge of the lack of the exercise of due diligence in appointing them. The Ice King (D. C. N. Y.) 256 F. 895; Boston Marine Insurance Co. v. Metropolitan Redwood Lumber Co. et al., 197 F. 703 (C. C. A. 9).

The contention that the Steel Scientist was unseaworthy because information in the Supplements and Notices to Mariners regarding recently established lights was not noted upon the charts before sailing seems to me to be refuted by Judge Learned Hand's statement in Yokohama Specie Bank v. Mitsui & Co., Ltd., (Horaisan Maru) 73 F.(2d) 526, 529, 1935 A. M. C. 96, at page 100 (C. C. A. 2): "A ship need not be fit in all respects for all that she must meet on her voyage if she is equipped for any necessary adjustments, when she breaks ground. See, also, The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; Steel v. State Line S. S. Co., 3 App. Cas. 72, 90; The Steel Navigator, 23 F.(2d) 590, [1928 A. M. C. 388] (C. C. A. 2); The Mexican Prince (D. C.) 82 F. 484, affirmed on opinion below 91 F. 1003 (C. C. A. 2). Cf. The Niagara (D. C.) 77 F. 329."

In the Savannah Sugar Refining Corp. et al. v. Atlantic Towing Co. et al., 15 F.

(2d) 648 (C. C. A. 5), the Silverway was charged with unseaworthiness in not being equipped with adequate charts and sailing directions. It appeared that she did not have on board a United States government chart covering the waters to be traversed in approaching the mouth of the Savannah river, nor "United States Coast Pilot" book (sailing directions), but did have a general chart showing the western portion of the North Atlantic Ocean which did not give details as to soundings, etc., and the court said, 15 F.(2d) 648, at page 651: "We think that the evidence calls for the conclusion that the stranding was due, not to a failure to supply the vessel with charts or other publications giving information required for the proper navigation of her on the voyage in which she was engaged, but to the failure of her master to make proper use of information which was available to him, and to take reasonable precautions to avoid a danger which a reasonably skillful and diligent navigator, situated as he was, would have realized in time to avoid it."

In the Oritani (D. C.) 40 F.(2d) 522, 528, affirmed 54 F.(2d) 1075 (C. C. A. 3) suit was brought on behalf of cargo carried by the Oritani and lost when she stranded and charges of unseaworthiness were made. One of the charges was that the vessel was not provided with a "deviation card" having marked on it the error in deviation of the compass and that the errors of the compass when the vessel started on her voyage were unknown. The court said: "All authorities agree in treating the whole matter of correction of compass readings (which necessarily includes the obtaining of the requisite data) as a branch of the science of navigation. In the case of the Oritani, the master had always, from the time he left the dock, the means to obtain whatever information as to deviations was needful or advisable in order to complete the compass data. He could have taken observations of charted course at the dock or as his vessel started down New York Harbor. If this did not supply the required data, he could have headed upon the unknown points either within the Harbor of New York or immediately after proceeding to sea. It is difficult to see what act of diligence the owners could have performed beyond supplying him with accurate instruments to obtain this information."

If it was advisable to correct or adjust the charts on the Steel Scientist so as to indicate the lights which the recent Supplements reported had been established, this could just as well have been done "after proceeding to sea" as was held proper in respect to compass adjustments in the Oritani Case. See, also, The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241; International Navigation Co. v. Farr & Bailey, 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830.

In the S. S. Yungay (D. C.) 58 F.(2d) 352, cited by cargo interests, the vessel was held to be unseaworthy because she was supplied with a defective compass, but the inability to remedy it at sea was apparent.

Cargo interests cite the case of The Elkton, 49 F.(2d) 700 (C. C. A. 2) where a vessel sailed with a defective and leaky tank which was unused at the time the vessel departed on her voyage, but subsequently at an intermediate port was filled with oil under directions of the engineer. The vessel was held to be unseaworthy although her master knew of the defect when she sailed and could have guarded against its use and the consequences. The court said that it was a fault in management, but "in the management of a ship which required more care than the owner could exact at the shipper's peril." 49 F.(2d) 700, page 701. I think the Elkton Case is readily distinguishable, for in the present instance if the charts, Light Books, and Supplements had been properly used, the stranding would have been avoided, and no more care was imposed upon the Steel Scientist's navigating officers than the owner could reasonably exact.

In International Navigating Co. v. Farr & Bailey, 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830, also cited by cargo interests, the cover of a port had not been securely closed when the vessel sailed and cargo had been stowed and the hatches battened down so that the port was thereafter inaccessible. Damage to cargo resulted because it was impossible to remedy this defect when the contingency in fact arose. The vessel was held to have been unseaworthy. This differs materially from the situation on the Steel Scientist in respect to her navigating equipment, and which is more analogous to that in The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, where a shutter of a port was left open upon sailing for ventilation and because of the failure of the officers to close it when a storm arose, cargo was damaged, and the Supreme Court held that the neglect to close the shutter, which was accessible, was a fault in management.

and did not indicate unseaworthiness when the vessel sailed.

In my judgment the Steel Scientist was seaworthy and the disaster was due to a fault or error in navigation and the owner is entitled to exemption under section 3 of the Harter Act (46 USCA § 192).

Accordingly, a decree may be entered dismissing the libels of the cargo owners and awarding the United States Steel Products Company, the owner of the Steel Scientist, the unpaid contributions in general average.