## THE JASON.

(District Court, S. D. New York. May 22, 1908.)

1. SHIPPING—GENERAL AVERAGE CONTRIBUTION ON ACCOUNT OF SALVAGE—NEGLIGENT STRANDING OF VESSEL.

A steamer sailing from Cienfuegos for New York, on her fourth trip from such port during the same season and under the same command, stranded on the first night out in calm weather on Sambo Head a low lying rock several miles northward of the course she had taken on the previous voyages. The master used a British chart which was incorrect and contained a caution that its accuracy was not to be relied on, as no regular survey of the coast had been made. A more nearly correct chart had been made by the United States Coast Survey which could have been obtained, but the master made no inquiry. The vessel had proceeded for more than an hour before stranding over shoals and near charted reefs, which a vigilant lookout should have observed. *Held* that, in the absence of any reasonable explanation of the unusual position of the vessel, the stranding must be charged to her negligent navigation, and that she was not entitled to recover contribution in general average from the cargo owners on account of salvage expenses.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 602.]

2. SAME—SUIT IN GENERAL AVERAGE BY CARGO OWNER—EFFECT OF HARTER ACT.

Where a portion of a vessel's cargo was jettisoned on account of her stranding solely by reason of her negligent navigation, while section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) exempts the vessel and owners from liability to the cargo owner in tort for his loss, it does not affect the right of the cargo owner to maintain a suit against the vessel for a general average contribution in consequences of such loss.

3. SAME—SALVAGE—ADJUSTMENT IN GENERAL AVERAGE.

After a vessel had been stranded through negligent navigation, the owner contracted for her salvage, agreeing to pay a certain per cent. of her salved value, the agreement not extending to the cargo. After the vessel and greater part of the cargo had been brought safely into port, the cargo owners settled independently with the salvors, paying a smaller per cent. of the salved value than that paid by the shipowner. *Held*, that the latter payment was properly a salvage payment, made for the benefit of all interests, and that under the American law, and section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St.

1901, p. 2946]), in a suit by the cargo owners to enforce against the vessel, a general average contribution on account of cargo jettisoned, the shipowner was entitled to have the salvage payments made by the respective parties taken into the general average adjustment although not entitled to an affirmative recovery of any balance which might be due him on such adjustment.

[Ed. Note.—General average, see notes to Pacific Mail S. S. Co. v. New York, H. & R. Mining Co., 20 C. C. A. 357; The Santa Anna, 84 C. C. A. 316.]

## In Admiralty. Suit and cross-libel for general average.

On July 29, 1904, the Norwegian steamship Jason, under charter to the Ward Line, left Cienfuegos for New York, laden with about 12,000 bags of sugar and some general cargo. She sailed early in the afternoon, with fine weather and the moon in the last quarter. She encountered neither storm nor fog, nor were her navigators aware of any unusual or dangerous conditions until shortly before 4 a. m. of July 30th, when she stranded on Sambo Cambeso, or Sambo Head, a low lying rock about seven miles northwest of Dry Shingle Reef. The Jason under the same command had been in and out of Cienfuegos Harbor three times during the year 1904 and before July. Her master used for purposes of navigation a British admiralty chart, purchased in New York. On this chart, and also upon the charts of the United States Coast and Geodetic Survey, Dry Shingle is placed in north latitude 21 degrees 26¾ minutes. A chart had been published by the Hydrographic Office of the United States Navy in March, 1904, placing Dry Shingle in north latitude 21 degrees 22¼ minutes, and it is apparently conceded that the new position is more nearly correct than the old. The chart used on the Jason has printed upon it: "The coasts of the Island of Cuba, and especially the south coast, not having been regularly surveyed, the mariner is cautioned not to place too much dependence on this chart." And where Dry Shingle is indicated is printed the legend: "Dry Shingle reported to extend further south, 1883."

The Jason having passed out of Cienfuegos Harbor, set a course south 25 degrees west magnetic, and maintained it for 39 miles from Xagua Light. Having run this distance by 6:35 p. m., the course was changed to south 80 degrees west magnetic, and so held until just before the stranding, and when it was too late by any change of course to escape disaster. This course by the the chart in use would have carried the Jason approximately 10 miles to the southward of Dry Shingle Reef, and at least 14 miles to the southward of Sambo Head. Accepting the latest chart as correct, however, the course in question would have brought her within 5 or 6 miles of Dry Shingle and about 10 miles of Sambo Head. The distance run on the westerly course before stranding was between 70 and 75 miles, and, in order to go ashore, the Jason in running that distance had to get out of her course at least 10 miles, and had passed through 11 or 12 miles of shoals and reefs to the northward of Dry Shingle before she finally fetched up. The captain went to his berth at 11:30 p. m., and was not called until stranding was unavoidable. When breakers were seen ahead, or nearly so, the wheel was ordered astarboard, and, when the vessel was fast, she was heading by compass W. by S. ½ S. There is no evidence as to the exact amount that she swung under her starboard wheel further than that she swung "very little." After midnight there were only the second officer and two men on deck, and the lookout had gone to call the watch shortly before the stranding; but how long before that he left his post does not appear. On the same day that the Jason went ashore a passing steamer took her first officer back to Cienfuegos, whence her condition was cabled to New York. The owners' agent, with consent of all parties in interest, agreed with the Merritt & Chapman Derrick & Wrecking Company that their tug Premier, then lying at Kingston, Jamaica, should go forthwith to investigate the Jason's situation and report what could be done, this for the agreed price of $1,000. The Premier performed this duty, and reported from Cienfuegos after viewing the Jason. The owners' agent being then unable to communicate speedily with the cargo owners agreed on behalf of the hull that the Merritt Company should salve the Jason for 40 per cent. of the salved value. No agreement was made with respect to the

cargo. While the steamer lay on the reef about a sixth of her sugar cargo was jettisoned. When the Premier returned the task of releasing the Jason from her position proved considerably easier than was anticipated the weather remaining unexpectedly favorable; and she was finally taken under convoy to New York and discharged most of her cargo uninjured. The owners and underwriters of the major portion of the cargo made an independent settlement with the salvors for approximately 25 per cent. of salved value. The usual average bonds having been given and an adjustment having been made at the instance of the hull owners they bring the original libel herein, alleging that the stranding was without negligence or fault on the part of the Jason, that all salvage expenses are to be considered as having been incurred for the common benefit in one continuous salving operation, and demanding upon an adjustment of accounts that Arbuckle Bros, as owners of the major portion of the salved sugar pay in general average $5,061.24.

The cross-libel brought by Arbuckle Bros. against the shipowners alleged that the stranding and consequent damages were solely caused by the incompetency of the Jason's master, the defective condition of her compasses, and faulty and negligent navigation; and it further asserts that salvage expenses are not the subject of adjustment in general average, so that excluding the payments and losses of the shipowners by reason of the negligent navigation aforesaid, and excluding also the salvage payments of all parties, there results a general average contribution arising principally from jettisoned cargo due to Arbuckle Bros. in the amount of $3,482.76.

Harrington Putnam, for the Jason.
Lawrence Kneeland, for Arbuckle Bros.

HOUGH, District Judge (after stating the facts as above). If the Jason stranded through negligent navigation, or by reason of the defects of construction, equipment, or fitting alleged in the cross libel and the answer to the original suit, the shipowners' action must be dismissed. There is, I think, no evidence justifying the belief that the ship's compass was so defective as to be the proximate cause of disaster, or that the master was incompetent, or that the ship herself was unseaworthy. The question then remains whether the stranding was due to negligent or careless navigation.

The fact that she did go ashore in calm weather, and on a frequented route which she had already traveled several times under the same command, puts on the original libelants the burden of showing sufficient of the attending circumstances to warrant the inference that she stranded without fault. The Nicanor (C. C.) 44 Fed. 509. That burden I do not think the original libelants have successfully borne. The chart by which their master navigated bore on its face a warning of unreliability, and was at once a suggestion to careful mariners of extreme caution while using it, and of the necessity of getting better charts if by inquiry they could be obtained. Four months before this accident a better chart was obtainable, but no inquiry was made, while a comparison of the courses steered by the Jason on leaving Cienfuegos on previous occasions shows a variation of method irreconcileable with care. In January and April, 1904, she had gone, according to her own testimony, much further south before turning west, yet varied her westerly course without any apparent reason. In June, 1904, she pursued, according to her master, a course which would have taken her directly over Dry Shingle, yet nothing happened, and the reef was not even observed. This last course could not have been steered as testified to, but its statement casts serious doubt on

the accuracy of the master's calculation. Further, it seems quite incredible, if a proper lookout was maintained on the night of July 29th–30th, that the vessel could have proceeded for more than an hour over shoals and near charted reefs and through water of necessarily lighter color than the deep sea without any of these phenomena being observed in probable time to avert disaster. Yet, considering the course sworn to, the heading of the ship on taking the ground, and the charted position of the dangers to navigation, warnings must have presented themselves and been unobserved by the Jason's crew. In a case such as this it is incumbent on the shipowners at least to suggest some reasonable explanation of the unusual. But one suggestion is made, viz., that by a northerly current the Jason was set at least 10 miles out of her course in traveling not over 75 miles. But no such current ordinarily exists in this region. It does occur after a severe northerly storm, because the water, having been blown away from the south coast of Cuba, flows back when the pressure is removed; yet in proceeding southerly 39 miles the Jason made her full speed by the land, which is irreconcilable with the strong current asserted; and, finally, there is absolutely no evidence of the necessary antecedent northerly storm. It is for the libelants to show at least the strong probability of this current and excuse their master's ignorance of it. They have failed to show such probability, and the presumption, therefore, remains that it was negligent to go ashore in calm and clear weather. This finding of fact compels the dismissal of the original libel, under The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130.

The cross-libel is filed on the theory that the decision just cited intended to and did leave the law of general average unaffected by the Harter act. Act Feb. 13, 1893, c. 105, 27 Stat. 445, § 3 (U. S. Comp. St. 1901, p. 2496). The court did recognize the Harter act as relieving the shipowner (under certain circumstances) from "liability for the negligence of his servants," but denied that it conferred upon him any new or affirmative right of recovery in general average or otherwise against the owners of cargo lost or damaged by such negligence. The statute was declared to be a shield against one particular form of attack by shippers; i. e., a claim in tort for negligence, or in contract for breach of the agreement for safe carriage. But the Supreme Court did not hold that the fault or tort or negligence was extinguished by the statute. On the contrary, it approved the words of Jessel, M. R., in a case involving the same train of thought—"it [the statute] does not make [the shipowners'] acts right if they were previously wrongful"—and expressly disapproved the language of this court in saying (82 Fed. 474–477):

"In such cases (i. e., where due diligence has been observed) faults in the navigation or management of the ship are no longer by construction of law faults of the owner, and the ship and her owner are now no more liable to the cargo owner for damages therefrom than the latter is liable to the shipowner for the resulting damages to the ship. Both are alike strangers to the fault."

Cross-libelants' interpretation, therefore, of this leading case leaves a cargo owner to do just what he could have done before the Harter act—i. e., seek contribution in general average even from a tort-feasor

—but what before that statute he never did do, because he then had a larger remedy, and could recover in solido for the wrong done him. But neither before nor after that act could the negligent shipowner advance as a defense or set-off any claim of contribution to himself. He could not do this before the act, because (1) in the form of action then used he had no technical opportunity; and (2) if action in general average had been resorted to by some ill-advised shipper, the same tort would have prevented the negligent ship recovering even a partial solatium for what was her own fault, nor could he do this after the act because the statute had not extinguished nor excused the original negligence. It did no more than prevent the assertion of a particular form of liability—i. e., that based on the tort, but made no change in the always existing (but not used) liability to contribute to a sacrificial expense beneficial to the wrongdoer among others— such sacrificial expense being the basis of a sort or kind of action entirely different from that arising on the tort itself. It is obviously true that the ground of recovery, the cause of action in general average, is wholly different from that in any suit to recover damages for negligence; the reason of the former being the benefit conferred by libelant on respondent, and of the latter the wrong done by respondent to libelant.

An examination, however, of the original record in The Strathdon (D. C.) 94 Fed. 206, affirmed 101 Fed. 603, 41 C. C. A. 515, shows that this view of the statute was advanced in that case and supported by the same arguments adduced here. The District Court in the case cited clearly held that in an action substantially like the one at bar any recovery by way of general average would, like complete restitution by action for negligence, be based on "a nonexistent legal wrong" (page 210 of 94 Fed.); i. e., nonexistent because extinguished by the Harter act. That court held that, because the Harter act had extinguished the tort and disabled a cargo owner to assert the same as the cause of action, the same extinguishment had enabled the shipowner to have his claim considered in general average. I find it difficult to perceive any difference between this statement and that of this court (above quoted) that shipowner and cargo owner since the Harter act "are alike strangers to the fault." Yet the Circuit Court of Appeals, although deciding the Strathdon on the ground that there was no fault whatever in the shipowner, expressly approved the reasoning of the District Court in words too plain to be disregarded, even though such approval was not necessary to the decision of the case as finally disposed of. It must therefore be held here, not only that the cross-libelants can maintain their suit for a general average contribution, but that the principle of adjustment must be the same as if the Jason's stranding had been due solely to vis major and the ship free from any fault at all; or, in other words, the effect of the decision in the Strathdon is to blot out the fact of negligence when the action is promoted by an innocent libelant and leave it as a bar to any suit begun by the tort-feasor. The figures revealed by the pleadings seem to show that if the salvage payments made by the owners of the Jason and Arbuckle Bros., respectively, be regarded as expenditures for common benefit and allowable in general average, the adjustment will re-

sult in a balance in favor of the Jason, and it therefore becomes necessary to consider the nature of salvage payments or awards in relation to such adjustment.

Whether salvage shall be considered in general average under the exact circumstances here shown is confessedly a new question. The average bond produced requires that the losses and expenses shall be stated and apportioned "in accordance with the established usages and laws in similar cases," but this does not much advance the discussion, for neither in reported cases nor in the evidence of the experts produced is there found any identical instance. It is, however, shown by the testimony that the long-established custom of American adjusters is to treat the expense of a continuous salvage operation as a charge distributable over the several interests. The language of the witnesses leaves no doubt of the principle as understood by them, but their instances, gleaned from long and varied experience, show no closer application of it than a redistribution of one award over interests whose values had been more accurately ascertained by the adjusters than had been done in the legal proceedings wherein the award was given. The work of Mr. Dixon on Marine Insurance and Salvage, published in 1862, may, I think, be relied on as showing the established practice of New York adjusters, and he lays it down as a general principle (page 102) that, "where ship and cargo are saved together, the total salvage is apportioned upon the ship and cargo according to their respective values." This usage is in accordance with the law; for, "when a vessel is accidentally stranded in the course of her voyage and by labor and expense she is set afloat and completes her voyage with the cargo aboard, the expense incurred for that voyage, as it produced benefit for all, so it shall be a charge upon all according to the rates apportioning general average" (McAndrews v. Thatcher, 3 Wall. 347, 18 L. Ed. 155), expressly approving Bedford Commercial Assurance Co. v. Parker, 2 Pick. (Mass.) 7, 13 Am. Dec. 388, and Phillips on Insurance, § 1340, which are to the same effect. Cf. The Congress, 1 Biss. 42, Fed. Cas. No. 3,099. The nature of salvage in this regard is compendiously stated by Brown, D. J., in International Navigation Co. v. Atlantic Mutual Ins. Co. (D. C.) 100 Fed. 312, affirmed 108 Fed. 987, 48 C. C. A. 181, certiorari denied 181 U. S. 623, 21 Sup. Ct. 926, 45 L. Ed. 1033:

"Whatever the ship or owner is obliged to pay under such a decree [for salvage] * * * being a charge and lien upon the ship, is as much an appropriation of the ship pro tanto to the common safety, to her hurt, detriment, and damage, as the cutting away of her masts would be, or a jettison of goods for the same purpose."

There can be no doubt that from the time the Premier went to work until the Jason arrived under convoy at New York with her salved cargo on board there went on a continuous service of the kind ordinarily called salvage, and such successful service benefited both hull and cargo. If the result of this operation had been a suit affecting all interested, and one decree had been entered awarding the same percentage of recovery against the several values found or agreed upon in the action, there can be no doubt but that such award would by

American law and the practice of New York adjusters have been carried into any adjustment had, even though the values had been varied by further or better information.

But it is urged here that the payments made should all be excluded because (1) they (or at least the moneys paid by the hull owners) are not properly salvage—i. e., amounts recoverable under the maritime law for services rendered voluntarily and not under contract—or because (2) the parties in interest having made their own several bargains (a) at different rates, and (b) at different times, there was no sacrifice for common interest and no equitable reason exists for opening or changing each man's bargain made in self-interest alone. It is suggested in Carver on Carriage by Sea (4th Ed.) § 394, that salvage "in the strict sense" as above defined is not within the principle of general average. This I believe to be contrary to the American decisions, but the present argument varies the claim to meet our law, and insists that private contracts will not support a true salvage recovery. The argument which makes a distinction between salvage and services in the nature thereof is very artificial at best; but to assert that salvage depends for its existence on the nature of the agreement, whether express or implied, on land or at sea, by virtue of which the work is entered on, is too refined to be sound. The nature of the service, its recognition by maritime law, and the remedies for its enforcement are identical whether or not there be any agreement other than that implied by going to the assistance of the ship in peril, provided only that the reward be dependent on success and obtainable only out of the rescued property. See a "salvage contract" considered in The Alert (D. C.) 56 Fed. 721, where, if any distinction such as here suggested had existed, it would most appropriately have been made. The service to the Jason and her cargo was salvage as that term is used in the American cases cited and many others.

It is, however, true that not "all salvage charges are to be deemed a general average." Peters v. Warren Ins. Co., 1 Story, 463, Fed. Cas. No. 11,034. It is only when the expense is incurred for the benefit of all concerned that such is the case, and the contention of the cargo owners accordingly is that neither what they paid the Merritt Company nor what the owners of the Jason so paid was for common benefit. On this point the time of payment or agreement must be immaterial. Whether several persons pay or promise to pay at one time or another is of itself no evidence to show or disprove a community of interest.

As to the remaining part of cross-libelants' argument, I am convinced that the fact of the shippers having after the peril made a settlement better than the owners could make a bargain beforehand is a point rather specious than sound. If the owners' agent had made an entire contract with the salvors to rescue both cargo and ship for a definite sum, then in so far as that contract was reasonable such reasonable "disbursement (thereunder) in so far as it was a disbursement for the salvation of the whole adventure from a common imminent peril may properly be charged to general average." Ocean S. S. Co. v. Anderson, L. R. 10 App. Cas. 107. The contract the ship's agent did make was really this: The Merritt Company was to get 40 per

cent. of the salved value of the vessel, and whatever the court or agreement might allow on the salved value of the cargo; but the company was to salve both vessel and cargo. The agreement was one. The compensation only was not fully agreed on. It must be found that this agreement was reasonable considering the time of year and probability of hurricanes, the dangerous nature of the coast and the likelihood of loss of cargo by melting. The truth is that a high charge was made for the hull because it seemed unlikely that there would be much cargo left. It was not the cargo owner that made the original and essential bargain. It was the ship's agent; but the cargo owner ratified that bargain, and united in sacrificing something for the common benefit when he paid money to the salvors. It seems to me, therefore, that this salvage expense, however or whenever liquidated, was something done for common benefit, and therefore should under American law be brought into the general average adjustment. The cases of salvage awards at rates differing in the same decree as against hull and cargo (The Velox, L. R. 1906, Prob. 263; The Lahaina [D. C.] 19 Fed. 923; The Cyclone [D. C.] 16 Fed. 486) do not in my view militate against this conclusion. The test in general average is not what it was worth to each interest to procure its own salvation. That is no more to the point than the fact that some shippers of goods may prefer them to be lost rather than saved. The test is whether there was in law a voluntary sacrifice for the common benefit, and the moment salvage is paid or agreed to be paid on goods saved with the vessel such sacrifice exists. No shipper is compelled to take his goods. He may permit them to be sold by the salvors; but, if he elects to take his goods and pay the salvage and signs an average bond, he is by his own act entitled and subject to contribution for all the sacrifices which in a legal sense were voluntarily made before any separation of interests took place. Taking, therefore, into consideration the respective contributions of hull owners and shippers towards salvage expenses, it appears to me that no balance is due to Arbuckle Bros. If counsel think my computation in error in this regard, a reference may be had, if the amount is not agreed upon. While believing that under the decision in The Strathdon, supra, there can be no adjustment in general average without taking into consideration the sacrifices of these negligent shipowners, it is impossible that such advances can be used further than to defeat the otherwise valid claims of the shippers. The hull owners can have no affirmative recovery in any form of action. The cross-libel is therefore also dismissed.

Both dismissals will be without costs.