284

## THE MARIA.

District Court, E. D. Virginia, Norfolk Division.

May 20, 1936.

Hughes, Little & Seawell, of Norfolk, Va., for libellant.

Vandeventer & Black, of Norfolk, Va., for respondent.

WAY, District Judge.

This is a libel in rem in which the libellant seeks to recover the value of lumber shipped by it in the motor vessel Maria at New Orleans in May, 1932, for transportation to Trepani, Sicily. At the time of shipment the Master of the Maria signed bills of lading acknowledging the receipt of the lumber which documents constitute the contracts of transportation. The Maria sailed from New Orleans on May 20, 1932, and proceeded to Houston and Galveston, Texas, for additional cargo. Originally it was contemplated that the vessel should proceed directly from the Texas ports to Trepani. However, prior to her sailing from New Orleans, the Maria's agents at

that port and her master were notified that the Maria was to call at the port of Wilmington, North Carolina, after completing her calls at the Texas ports. In the clearance papers of the Maria executed under oath by the master at New Orleans it was stated that Wilmington was one of the intended ports of call. The lumber shipped by libellant was all loaded on the deck of the Maria. Having finished taking on cargo at Houston and Galveston the Maria sailed from the latter port on June 7, 1932, for Wilmington. This was the Master's first voyage to Wilmington, and he was not familiar with the waters in that vicinity. The voyage from Galveston to Wilmington was uneventful until about 6:45 A. M. June 12, 1932, at which time the ship stranded on Frying Pan Shoals off the shore from Wilmington. On June 15th all of libellant's lumber was jettisoned and the following day the Maria was pulled off the strand. From Frying Pan Shoals the Maria proceeded to Newport News, Virginia, for the purpose of having a survey and making repairs rendered necessary by the stranding.

This libel was filed at Norfolk on July 5, 1932. On July 7, 1932, libellant having subpoenaed Captain Gianni Gladioli, the master of the Maria, called and examined him as its witness. The subpoena served upon the master required him to produce, among other things, the following:

"(1)—All charts which were board the motorship 'Maria' at the time that vessel stranded on her last voyage, covering the waters between the Gulf of Mexico and Wilmington, North Carolina, and particularly the exact chart which was being used in the navigation of said motorship approaching the port of Wilmington, North Carolina, at the time the vessel stranded at about 6:45 A. M. Eastern Standard Time, on June 12, 1932;

"(2)—All light lists, pilot books and sailing directions which were on board the motorship 'Maria' at the time she stranded covering the vicinity of Frying Pan Shoals, and the approaches to Wilmington, North Carolina."

In response to the subpoena, the master appeared before the officer designated in the subpoena, with a sealed bundle of charts and a sealed package which latter he stated contained an American light book which was on the Maria. These packages had been prepared by the master for delivery to the Italian Consul to be

forwarded by the latter to the Italian Government in connection with the stranding. At the time the master's deposition was taken the Italian authorities had not authorized the opening of the sealed package and bundle thus produced by him, but subsequently, pursuant to permission from those authorities the seals were broken and photostats of the charts therein were made. These photostats are filed as exhibits in this case. The charts contained in the bundle produced by the master proved to be:

"C. & G. S. Chart 1110, dated Nov. 1925, corrected to Oct. 9, 1926 (Photostat offered as Lib.Ex. 8; on dep. Ex. 9B);

"C. & G. S. Chart 1236 dated June, 1926, corrected to Feb. 16, 1928 (Photostat offered as Lib.Ex. 9; original offered as Cl.Ex. 6; on dep. photostat was Ex. 9C);

"H. O. Chart 943, dated January, 1923 corrected to May 2, 1925 (Photostat offered as Lib.Ex. 7; on dep. Ex. 9A)."

On July 16, 1930, the position of Frying Pan Shoals lightship and that of a buoy marked 2AFP were changed. The distance between the new position of the lightship and its position prior to July 16, 1930, was approximately 14 miles. Prior to July 16, 1930, the buoy 2AFP was located about 2 miles from where the lightship has been located since July 16, 1930. The distance between the present location of buoy 2AFP and its location prior to July 16, 1930, is about 12 miles. The master of the Maria in his deposition testified that the position of his vessel by navigation at the time of the stranding was latitude 33 degrees 43.7 minutes north, longitude 78 degrees .03 minutes west. Some days later he discovered that his ship was actually stranded in the position, latitude 33 degrees 37.4 minutes north, longitude 77 degrees 50.5 minutes west. The distance between the two positions is actually about 10 miles.

The package produced by the master of the Maria in obedience to the subpoena contained the Light List for the Atlantic Coast United States, 1930, issued by the Department of Commerce, Lighthouse Service. This book also showed the position of Frying Pan Shoals Lighthouse and buoy 2AFP as they were prior to July 16, 1930, and contained no reference to the buoy 2FP as a lighted buoy. The subpoena duces tecum served upon the master and quoted in part above, it seems to me, unmistakably called for the production of all the navigational data and equipment aboard the Maria which related to Frying Pan Shoals and vicinity and the evidence is clear that the master so construed the subpoena at the time he appeared for his deposition to be taken.

All of the navigational data thus produced by the master of the Maria in response to the subpoena showed the positions of Frying Pan Shoals lightship and of buoy 2AFP as they were located prior to July 16, 1930, and also showed the buoy marked 2FP as an unlighted whistle buoy, which in fact it was prior to March 3, 1931.

The government authorities after these changes were made in the location of the lightship and buoy 2AFP and in the characteristics of buoy 2FP, gave prompt and ample notice of the changes to mariners generally and long prior to the voyage and stranding in question, that information was contained in appropriate government publications in this country and in England and Italy also. In addition, non-governmental publications of interest to mariners carried similar information. It further appears that the United States Government has afforded to mariners and others interested in such information ample, convenient and inexpensive facilities for informing themselves not only of changes such as these after they are actually made, but also, information in advance, that the changes were proposed to be made, so that the failure of a vessel under circumstances such as disclosed in this case, to have aboard and ready for convenient use correct and reliable navigational data and equipment with respect to so important aids to navigation as the lightship and buoys referred to is not excusable.

In his deposition the master of the Maria testified positively that he had been asked to produce all the charts that he had on the Maria which covered the waters from Galveston to Wilmington; that he had produced all the charts on the Maria which covered those waters; that he had produced all the charts which he actually used in the navigation and that they were present under seal, and that the charts so produced covered Frying Pan Shoals and vicinity. He further testified that the charts on the Maria not under seal were general charts, not coast charts, and were "for outside navigation." The three charts, *not under seal*, produced by the master did not relate to the waters of Frying Pan Shoals and vicinity.

The master also testified that since the stranding he had learned that the Frying

Pan Shoals Light vessel had been moved from the position' that was shown on the Maria's charts, that before the stranding he did not know anything of such change, and, more important still, that there was no information' on his ship showing that the light vessel had been moved.

While there is other substantial evidence which with that already referred to illustrates the obsolete and highly erroneous character of the information disclosed by the charts and other navigational data with respect to Frying Pan Shoals and vicinity which the master of the Maria produced from the Maria in obedience to the subpoena, it is not deemed necessary to go into further details with respect to that phase of the case.

It has also been shown with unmistakable certainty that the Maria as she approached the vicinity of Frying Pan Shoals and Wilmington was in fact navigated in reliance upon the charts and other navigational data which the master produced when his deposition was taken. The stranding resulted solely from reliance upon and use of the erroneous and obsolete navigational data to which reference has just been made.

At the trial, the claimant sought unsuccessfully, to have his deposition suppressed on the ground that being present in court and available to be called in person, his deposition theretofore taken could not properly be read, but, if I correctly understand the contention, that he must be called and examined again if the libellant desired the benefit of his testimony.

Following the overruling of that contention, the proceeding was unusual in that the claimant then sought, chiefly through his own testimony, to avoid the damaging testimony which he had given in his deposition on July 7, 1932, and to establish a radically different set of facts in support of a theory advanced at the trial that ample and correct navigational data respecting Frying Pan Shoals and vicinity was aboard the Maria and readily available at the time of her stranding, but that the master and navigators of the vessel failed to avail themselves of such supposed data. In his testimony at the trial the master admitted that he had recently read the transcript of his deposition of July 7, 1932, and that his answers were correctly reported in the transcript.

I further find that notwithstanding the master knew before sailing from New Orleans of the intended call at the port of Wilmington, that he had never visited that port, and was therefore not familiar with those waters, that he took no steps at New Orleans, Houston or Galveston to obtain correct charts and other necessary navigational data with respect to Frying Pan Shoals and vicinity. The testimony given as to action which he claims to have taken before sailing from the Texas ports and as to what he intended to do by way of correcting charts and the like during the voyage to Wilmington is found to be vague, indefinite and wholly unreliable.

The master, as claimant of the vessel, was called to the stand as the first witness in his own behalf, and a great part of the trial was consumed in this effort on his part to show that there was in fact on the Maria navigational data and equipment which correctly showed the location of the lightship and buoy 2AFP after July 16, 1930, and that the cause of the stranding was not lack of proper data and equipment but failure on the part of the Maria's navigator to use it. His testimony at the trial which occurred February 18–21, 1936, was patently the result of a studied and determined effort, with slight regard for the truth, to destroy the effect of his deposition taken at. Norfolk July 7, 1932. In this testimony the master was supported by certain members of the crew of the Maria. On the new set of supposed facts thus attempted to be established, the claimant endeavored to show by expert witnesses that the Maria was fully equipped and seaworthy to make the voyage from Galveston to Wilmington.

No useful purpose can be served by reviewing at length the mass of unreliable testimony thus presented by claimant in the effort to overcome his own testimony given under oath shortly after the stranding. It is sufficient to say as to the expert testimony, that its lack of value lies in the fact that to a great extent it assumed to be facts, what the Court cannot escape concluding are not facts at all. In brief, the Court is unable to escape the conclusion that the data and equipment concerning Frying Pan Shoals and vicinity produced when the master's deposition was taken was all that was aboard the Maria on that subject, and that the major part of the testimony of the master and the members of his crew given at the trial to the contrary, is purely the result of afterthought and is unworthy of belief. On this issue the Court therefore finds that the Maria was unseaworthy in the respects above set forth

for the voyage in question and that such unseaworthy condition was the sole cause of the stranding.

■ As a further defense to the claim of libellant the answer of claimant alleges that a portion of the cargo covered by the bills of lading mentioned in the libel, was delivered to the consignees at destination upon execution of general average agreements secured by cash deposits; that the claimant applied to the Italian Court at Trieste, of competent jurisdiction to make an adjustment of general average and to adjudicate the question of the ship's seaworthiness; and that the Court appointed two average adjustors to act in the matter and directed the claimant to turn over the general average deposit collected to the adjustors.

It is further alleged, in substance, that the Court of Trieste gave notice to all interests, including the consignees of the cargo involved in this suit, and thereupon determined all questions connected with the adjustment including the question of the seaworthiness of the Maria, that the owners of the cargo involved in this proceeding were parties to the litigation in the Italian Court and that all the issues here presented including the question of the seaworthiness of the Maria, were therein submitted and decided and are now res adjudicata.

A mass of testimony consisting of documents, interrogatories and cross-interrogatories has been submitted with respect to what occurred before the adjustors and the Tribunal at Trieste. I find, however, that the claimant has signally failed to establish either that the owners of the lumber voluntarily submitted the claims here under consideration to the Tribunal at Trieste which is alleged to have adjudicated these matters or that the said Tribunal ever obtained jurisdiction over the claims through any valid proceedings or notice to libellant or to those for whose benefit libellant has sued.

Briefly, the evidence relied on by the master shows that the issue as to the seaworthiness of the Maria was never presented to or considered by the adjustors or the Tribunal at Trieste except in a purely ex parte and very casual manner. The adjustors gave no notice to the cargo owners of their intention to consider that question. Apparently only the Cosulich Steamship Company, the owner of the Maria, was ever heard. All of the evidence presented or considered with respect to the issue of seaworthiness came from that Company or an alleged expert selected by the adjustors. The master of the Maria was not even examined under oath as to the condition of the Maria and no one else was invited to submit any evidence on that issue. The report of the adjustors when completed was merely handed over to the Tribunal at Trieste and no notice of the application for approval and confirmation of the report was given either to the owners or consignees of the lumber in question.

It is difficult to conclude under such circumstance that the Tribunal at Trieste ever intended finally to dispose of the rights of others not parties before it, in the casual, ex parte manner indicated by the record and testimony upon which the claimant relies. The expert testimony before the Court in this case as to the applicable Italian law is to the effect that the action of the Tribunal at Trieste is neither final or binding upon the owners of the lumber cargo involved in this suit. Under such circumstances, the Court is forced to the conclusion that the defense of res adjudicata is not supported by the record upon which the claimant relies.

A decree in accordance with the conclusions herein announced may be presented for entry.