## THE MARIA.

### GLADIOLI v. STANDARD EXPORT LUMBER CO., Inc.

### No. 4178.

Circuit Court of Appeals, Fourth Circuit.
June 14, 1937.

Homer L. Loomis, of New York City (Loomis, Williams & Donahue, of New York City, and Vandeventer & Black and Braden Vandeventer, all of Norfolk, Va., on the brief), for appellant.

Henry N. Longley, of New York City, (Bigham, Englar, Jones & Houston, of New York City, Hughes, Little & Seawell, and Henry H. Little, all of Norfolk, Va., and Ezra G. Benedict Fox, of New York City, on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

SOPER, Circuit Judge.

The principal question in this appeal is whether the failure to furnish a ship with correct charts and similar data at the beginning of her voyage constitutes a lack of due diligence on the part of her owner to make her seaworthy, or is merely an error of navigation on the part of her master. The facts are that the motor ship Maria, a vessel engaged in the common carriage of merchandise, sailed from New Orleans on May 20, 1932, with a cargo which included 1,093 pieces of lumber for carriage to Trapani, Italy, under two bills of lading issued to Standard Export Lumber Company, Inc., the appellee. On March 15, 1932, she had sailed from Trieste upon an itinerary which included Mobile, New Orleans, Houston, and Galveston, and then back to Mediterranean ports. Before leaving Galveston the master was instructed by the owner through its local agents to proceed to Wilmington, N. C. for additional cargo. Neither her master nor any of her officers had ever sailed before to Wilmington. On June 12, 1932, in the early forenoon, under favorable weather conditions, she stranded on Frying Pan Shoals off the mouth of the Cape Fear river. The lumber was stowed on deck and all of it, together with other cargo, was jettisoned to lighten the ship. After she was floated, repairs were effected at Newport News and she resumed her voyage, proceeding first to Wilmington and thence to the Adriatic as originally intended. A libel in rem was filed by the shipper to recover the value of the lumber and the defense was that she was not liable for the loss under section 3 of the Harter Act, 46 U.S.C.A. § 192, since it was due to a fault in navigation or in management, and the owner had exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied.

The only question at issue was whether the vessel was seaworthy for a voyage to Wilmington when she left the Gulf ports. The libelant contended that she was unseaworthy for this voyage because of the failure to provide her with sailing charts or other navigational equipment correctly setting out the changed positions of a lightship and a buoy off the southeastern limit of the shoals known as Frying Pan Shoals Lightship and Frying Pan Shoals Gas Buoy 2 AFP, and showing buoy 2 FP as a lighted and not an unlighted buoy as it had previously been. The lightship had been moved fourteen miles to a point two miles from the location previously occupied by buoy 2 AFP, and this buoy had been moved to the prior location of the lightship. Buoy 2 FP was located about ten miles northwest of the first position of the lightship. The shipowner, on the other hand, contended that, even if the vessel lacked correct charts and similar data, the failure was merely the fault of the master to keep himself properly informed as to the exigencies of navigation to be met in the course of the contemplated voyage and did not constitute unseaworthiness on the part of the ship herself. A decree was entered for the libelant in the sum of $2,662.74.

On July 16, 1930, the position of the lightship and of the buoy 2 AFP were changed; and on March 3, 1931, buoy 2 FP was made a lighted buoy. On July 7, 1932, two days after the libel was filed in this case, the master of the ship was subpœnaed at the instance of the libelant to produce, among other things, all charts on board the vessel when she was stranded covering the waters between the Gulf of Mexico and Wilmington, N. C., particularly the chart which was being used as she approached Wilmington, and also all lists, pilot books, and sailing directions on board covering the vicinity of Frying Pan Shoals and the approaches to Wilmington. This subpœna obviously called for the production of all navigational data and equipment aboard the Maria which related to Frying Pan Shoals and the vicinity. In response the master produced certain charts issued by the United States Coast and Geodetic Survey and the United States Hydrographic Office, a light list for the Atlantic coast issued in 1930 by the Department of Commerce of the United States, the United States Coast Pilot Book, Section D, and the British Light List. This data showed the position of the lightship and buoy 2 AFP as they were located prior to July 16, 1930, and also showed buoy 2 FP as an unlighted buoy. There were no data of

any kind on the ship which showed the true situation, and all her officers were ignorant of the changes.

When the changes in the lightship and the buoy were made, the United States gave ample notice thereof to mariners generally, and long prior to the voyage in question, this information was set out in official publications in the United States, England, and Italy. There were branch offices of the United States Hydrographic Office in New Orleans and Galveston, and an office of the United States Coast and Geodetic Survey in New Orleans, in all of which corrected charts, light lists, pilot books, daily memoranda, and notices were available for examination by all mariners, domestic and foreign. Both the Hydrographic Office and the Coast and Geodetic Survey had agents in New Orleans and Galveston for the sale of their respective publications. On July 7, 1932, three weeks after the accident, the deposition of the master of the ship was taken. He testified that he had been asked to produce all the charts that he had on the ship which covered the waters from Galveston to Wilmington and that he had produced all such charts, as well as the charts actually used in the navigation, and that the charts produced covered Frying Pan Shoals and vicinity. When the case came to trial in open court on February 17, 1936, the claimant sought, chiefly through the testimony of the master, to avoid the testimony which he had given in his deposition by showing a different set of facts tending to support the theory that ample and correct navigational data respecting Frying Pan Shoals and the vicinity, including Radio Aids to Navigation, (1930 Ed.) were aboard the Maria at the time of her stranding, but that the navigators of the vessel failed to avail themselves thereof. The District Judge found, however, that the data and equipment concerning the vicinity of the stranding, produced in answer to the subpœna and discussed by the master in his deposition, were all that were aboard the vessel at the time and that the contrary testimony of the master and members of the crew was purely the result of afterthought and was unworthy of belief. See The Maria Standard Export Lumber Co., Ltd. v. Motor Vessel Maria, 20 F.Supp. 284, 1936 A.M.C. 1307.

The same conclusion was reached in the trial in the District Court of the Southern District of New York of certain suits growing out of the same accident brought by assignees of consignees of the cargoes of the vessel who upon her arrival at Trieste were required to make deposits to secure delivery of cargo free and clear of a lien for general average asserted by the shipowner. See The Maria (D.C.) 15 F. Supp. 745, 751, where the court discussed the conflict and contradiction between the testimony of the master at the trial and his prior deposition and felt compelled to "disbelieve his testimony rather than accept his fantastic explanation and qualify him as a scapegoat to aid the shipowner in escaping liability." We have examined the testimony and have reached the same conclusion as both of these trial courts, to wit, that the navigational data and equipment on the ship at the time of the accident were incorrect in that they did not show the changes in the lightship and the buoy above described. We are in accord also with the final conclusion which both courts reached on this branch of the case that as the vessel approached the vicinity of Frying Pan Shoals and Wilmington at the time of the accident, she was in fact navigated in reliance upon the faulty charts and navigational data which the master produced when his deposition was taken, and that, as a result, the stranding took place.

Nevertheless the claimant contends that the libel should be dismissed on the ground that the information on board a ship such as sailing charts, light lists, etc., with regard to the dangers of navigation which she may expect to encounter on a prospective voyage, is pertinent to the navigation of the ship and not to her seaworthiness; and hence a catastrophe brought about by erroneous information is to be attributed only to faulty seamanship or management, from the consequences of which, the owner, who has used due diligence to make the ship seaworthy, is relieved by section 3 of the Harter Act. The principal authorities adduced to support this argument are The Jason, 162 F. 56 (D.C.); Id., 178 F. 414, (C.C.A.); Id., 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969, and The Murrell, 200 F. 826 (D.C.); Id., 195 F. 483 (C.C.A.) In our opinion these decisions do not justify the sweeping conclusion contended for because it does not appear in any of them that the proposition was definitely advanced.

The Jason was a case of stranding and there was a libel by the shipowner and a cross-libel by cargo owners for general average. The principal questions arose

under a bill of lading containing a general average clause, which has since been known as the Jason clause, and which made both shipowner and cargo owners liable for contribution to general average in case the shipowner had exercised due. diligence to make the ship seaworthy and properly manned, equipped, and supplied. These questions were (1) whether the shipowner was entitled to general average contribution from the cargo owners by reason of expenses made for the salvage of the vessel and the cargo, and (2) whether the cargo owners were entitled to such contribution from the shipowner on the ground that the stranding was caused solely by the incompetence of the master, the defective condition of the ship's compasses, and faulty and negligent navigation. The District Judge, being of the opinion that the Jason clause was invalid under the interpretation placed upon the Harter Act in The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L. Ed. 130, held that, if the ship stranded either through negligent navigation or defects of construction, equipment, or fitting, the libel of the shipowner should be dismissed. He found no evidence that the master was incompetent or that the compasses were defective or that the ship herself was unseaworthy, but he found the master guilty of negligent navigation. The vessel was equipped with a chart, bearing a caution as to its reliability, that showed the shoal about four miles nearer to the charted course than the position indicated by a better chart which had been published a few months before the accident but had not been supplied to the ship. According to the latter chart, however, the course of the ship would not have brought her nearer than five miles from the strand. A comparison of courses steered by the ship on leaving port on previous occasions showed a variation of method irreconcilable with due care. Moreover, the evidence showed that, if a proper lookout had been maintained, signs of danger would have been discovered in time to have avoided the disaster. Having reached the conclusion based on these facts that the stranding was the result of bad seamanship, the court dismissed the libel of the shipowner and did not discuss the question whether the failure to supply the ship with the best chart available indicated a lack of due care on the part of the owner to render her seaworthy. The cross-libel was also dismissed because the District Judge was of opinion that the salvage payments made by the respective parties should be taken into account in the general average adjustment, and, when this was done, the balance was found to be in favor of the shipowner. The latter, however, was held not entitled to an affirmative recovery of the balance. The Circuit Court of Appeals affirmed the dismissal of both libels, holding as to the shipowner that the Jason clause was invalid and conferred no right upon him to share in the contribution for general average, and as to the cargo owners that they could not bring the shipowner as a contributing interest into a general average adjustment which might result in a claim that the Harter Act disallowed. The Circuit Court of Appeals, however, certified the legal questions involved to the Supreme Court, accompanied by the statement of fact that the ship was seaworthy and properly manned, equipped, and supplied, and that the stranding was due to negligent navigation. The Supreme Court held that the Jason clause was valid and not in conflict with the Harter Act, and that under the clause both the shipowner and the cargo owners were entitled to general average contribution.

It will be observed upon an examination of these decisions that the attention of the courts was focused upon the respective rights of the shipowner and the cargo owners to general average under the Jason clause in the case of a seaworthy ship stranded by the negligence of her navigators. No one seems to have made the point that the ship herself was unseaworthy because she was not equipped with a proper chart, and the statement of facts leaves it uncertain whether the latest available chart was entirely reliable. While the final result of the litigation would necessarily have been different if it had been found that the shipowner had not complied with the conditions of the Harter Act and of the Jason clause by using due diligence to make the ship seaworthy, the fact remains that none of the courts discussed the relationship of faulty charts and sailing data to the seaworthiness of the ship. The Supreme Court indeed had no occasion to consider the question because the recital of facts certified to it contained the statement that the ship was seaworthy.

In the case of The Murrell, 200 F. 826 (D.C.) a tug stranded because the master was not familiar with changes in the channel of which due notice had been published by the United States Hydrographic

Office; and the Harter Act not being applicable to the tug, the District Court held the vessel liable for damages to the cargo of the accompanying barge. Limitation of liability was, however, allowed, since the court was of the opinion that the evidence did not charge the tug owner with privity or knowledge in respect to her negligence. The court thought that, although it was shown that the master did not have the knowledge which might have enabled him to avoid the danger, the managing officers of the owner were not shown to be aware of this condition, and that it would set up too exacting a standard of proper equipment to hold that the owner failed to furnish a properly equipped tug because the master was not furnished prior to each voyage with all available sources of information in regard to impending dangers of navigation. On appeal ([C.C.A.] 195 F. 483), the decision was affirmed; but the court, accepting the decision of the District Court that the tug was at fault, made no mention of limitation of liability and confined its discussion to showing that the third section of the Harter Act does not exempt a tug owner from liability for loss of the cargo of a barge through negligent towage.

It is important to note that the court was dealing with a shipowner's application to limit his liability under the statute, 46 U.S.C.A. § 183; and that the burden upon the shipowner in such a case is much less onerous than that imposed upon him by the third section of the Harter Act when he seeks to be entirely relieved from liability for damage or loss of cargo. Ordinarily, when the owner seeks to prove an absence of privity or knowledge as to the unseaworthy condition of a ship under the first-mentioned statute, he need only show that he has employed competent agents to attend to the proper equipment of the vessel. Under the latter statute, his duty is not delegable and he must show not only that he employed competent agents, but also that they actually exercised due diligence to make the ship in all respects seaworthy and properly manned, equipped, and supplied. International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 225, 21 S.Ct. 591, 45 L.Ed. 830; The Southwark (Martin v. Southwark), 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; The Yungay (D.C.) 58 F.(2d) 352; Hockley v. Eastern Transportation Co. (D. C.) 10 F.Supp. 908; The Eastland (C.C.A.)

78 F.(2d) 984; Nord-Deutscher Lloyd v. President, etc., of Ins. Co. of N. A. (C. C.A.) 110 F. 420. The District Court in the course of its discussion of privity and knowledge in the Murrell Case did indicate that the failure of the owner to furnish adequate navigational data does not render a vessel unseaworthy, but it does not appear that the question was squarely presented and nothing at all was said about it in the opinion of the appellate court. In Trinidad Shipping & Trading Co. v. Frame, Alston & Co. (D.C.) 88 F. 528, Judge Addison Brown reached the opposite conclusion.

That the Jason and Murrell Cases have not been generally accepted as establishing the rule contended for is indicated by the decision in the case of The Steel Scientist, reported as Daisy Philippine Underwear Co. v. United States Steel Products Co. (D.C.) 11 F.Supp. 175, and United States Steel Products Co. v. American & Foreign Insurance Co. (C.C.A.) 82 F.(2d) 752. The vessel was stranded in a voyage around the world because the charts on board had not been corrected to show a certain light which had been established after a visit of the vessel to the same locality on a previous voyage. The means for correcting the chart, however, were aboard in the shape of navigational supplements and documents which showed the change. Cargo was lost or damaged and general average expenses were incurred as the result of the stranding. Libels were brought by shippers against the shipowner to recover for loss or damage to cargo and the shipowner filed a libel to recover contributions in general average alleged to be due from the cargo. It was held that under the Harter Act the shipowner was not liable for losses to cargo caused by the failure of the master to correct the charts, and also that under the Jason clause in the bill of lading the shipowner was entitled to share in general average contribution.

In order for the shipowner to be successful in either branch of the case it was necessary for it to show that it had used due diligence to make the vessel seaworthy. The District Judge said (11 F.Supp. 175, 179) that the issue of seaworthiness narrowed down to the question whether the vessel owner had provided adequate equipment or sources of information to enable her navigating officers to inform themselves as to the character and location of the recently established light, and he found

that the informative navigational equipment on board was amply sufficient for the purpose. It does not appear that any of the experienced members of the admiralty bar who took part in the case on either side ventured to suggest that the vessel's equipment of charts and like data had no bearing upon her seaworthiness. On the contrary, every one seems to have assumed, as the court held, that the shipowner was bound to supply the vessel with navigational equipment with which an ordinarily intelligent and careful mariner might safely navigate it. The dispute was whether a severer test should not be imposed and the shipowner compelled to show that the vessel's charts had been corrected with reference to the most recent data on hand before she sailed. Much expert testimony was taken on this point, the weight of which led the court to conclude that, if an owner provides his vessels with informative equipment and supplements bringing it down to date, reasonably sufficient to ensure the safe navigation of the vessel, and the information is supplied in such form as to be available to the navigator with a fair amount of effort, the vessel is not unseaworthy in this respect. On appeal the court noted that the single question in the case was whether all of the data should have been collated and put in its proper place before the voyage began. The court rejected the severer rule as an unnecessary counsel of perfection and said (at page 754 of 82 F.(2d)): "On the contrary we believe that a ship is well found, if she has the proper documents on board, and if when she sails, such of her charts and light lists are corrected as cover the waters she will enter before her officers will have ready opportunity to correct them." It is quite obvious that all of this controversy was beside the point if it was then settled law that a shipowner, in the performance of his duty to make his vessel seaworthy, is not required to furnish her with adequate navigational data; for the only answer offered to the contentions of the shipowner was that it had failed to use due diligence to make the vessel seaworthy in this very respect. See, also, Savannah Sugar Refining Corp. v. Atlantic Towing Co. (C.C.A.) 15 F.(2d) 648.

Our view of the law, now that the point has been definitely raised, is that charts, light lists, and similar navigational data are essential equipment for the safe navigation of a ship, that she is unseawor-

thy without them, and it is the duty of her owner to supply them. Such documents of course become sources of information for the navigator, and the task of securing them is often delegated to officers of the ship. Failure to supply adequate information or navigation without it may thus constitute negligent navigation or management for which they are chargeable; but it does not follow that the owner is thereby relieved by the Harter Act from liability from ensuing disaster, because the same circumstances may also amount to failure on his part to use due diligence to make his vessel seaworthy. The duty of an owner in this respect is nondelegable; and the navigation of a ship defectively equipped by a crew aware of her condition does not relieve the owner of his responsibility or transform unseaworthiness into bad seamanship. See Texas & Gulf S. S. Co. v. Parker (C.C.A.) 263 F. 864; The Framlington Court (C.C.A.) 69 F.(2d) 300; The Elkton (C.C.A.) 49 F.(2d) 700; The Fred E. Hasler (C.C.A.) 55 F.(2d) 919.

The additional defense was offered by the claimant in the pending case that, even if the ship was equipped with faulty charts, and such equipment would render her unseaworthy for a voyage to Wilmington upon the course actually followed on this occasion, nevertheless the ship was not unseaworthy for the voyage which was contemplated when she left Galveston. The factual basis for this argument was furnished by testimony of the master at the hearing of the case to the effect that when he left Galveston he intended, after passing through the Florida Straits, to sail up along the coast to the Cape Fear river inside the Gulf Stream on a course which would not bring him in the vicinity of the lightship and the buoys, and that later during the course of the voyage he changed his mind and decided to continue in the Gulf Stream until off Frying Pan Shoals. No reference to this change of plan was made in his earlier deposition in the course of which he said that he followed the route customarily used in the middle of the Gulf Stream. The District Court found that the master did not decide during the voyage to follow a course different from that contemplated when the vessel sailed from Galveston, and that the course followed by him to the lightship was proper, regular, and safe if the vessel had been equipped in a seaworthy manner. The District Judge in the case in the South-

ern District of New York reached the same conclusion. We are of opinion that these findings were correct.

It is of interest that in a suit in Italy brought by holders of bills of lading and receivers of cargo in Italian ports for the purpose of recovering deposits of money exacted from them by the master of the ship under a claim of general average, the court made similar findings of fact with reference to the faulty nautical charts of the ship and the alleged change in the contemplated course of the ship on her way from Galveston to Wilmington and the cause of the stranding, as appears from a decision of the First Part of the Court of Appeal of Trieste rendered on June 22, 1936.

Affirmed.